*404
 
 MEMORANDUM OPINION
 

 KAPLAN, District Judge.
 

 This case comes in the aftermath of the near collapse of the German metals and engineering conglomerate, Metallgesells-chaft AG (“MGAG”), in late 1993.. Reportedly faced with crippling trading losses from over-exposure in the oil futures market, MGAG nearly was forced into bankruptcy before its creditors, including Deutsche Bank AG, stepped in with an emergency loan and rescue package. Although this bail out averted financial disaster, the fallout continues and includes this case.
 

 I
 

 Parties
 

 Plaintiffs in this case are seventeen corporations engaged in the business of marketing and/or distributing petroleum products in the United States. Defendants MG Marketing and Refining, Inc. (“MGRM”), Metallgesellschaft Corp. (“MG Corp.”) and MGAG (collectively the “MG Group”) are in the business, among others, of selling petroleum products. MGAG is the sole shareholder of MG Corp., which in turn is the sole shareholder of MGRM. Defendant Deutsche Bank AG was a major shareholder of MGAG at all relevant times. Defendant Deutsche Bank North America is a subsidiary of Deutsche Bank AG, and defendant Deutsche Bank New York is a subsidiary of Deutsche Bank North America.
 
 [1]
 

 The Contracts
 

 Plaintiffs here allege breach of certain long-term petroleum supply contracts, entered into between January and September of 1993,
 
 [2]
 
 each of which provided that MGRM would sell, and the relevant plaintiff would buy, a fixed amount of a specified petroleum product over a period of time, usually five or ten years, at a fixed price.
 
 [3]
 
 The contracts were known as “flexies,” so titled because they permitted plaintiffs flexibly to schedule delivery of the product on 45 days’ notice, rather than obliging them to take delivery on fixed dates.
 

 The contracts were flexible in another respect — they included a cash out, or “blow out,” option exercisable by the customer which provided in relevant part as follows:
 
 [4]
 

 “(a) At any time during the Term of this Agreement that the Fixed Cash Price is less than the bid price for the applicable NYMEX Futures Contract, as defined in subparagraph (d) below, Purchaser may, in lieu of accepting all or part (in lots of 42,000 gallons) of the remaining deliveries of Product, accept cash payments from Seller based on the average of bid prices obtained by Seller in totally or partially liquidating its long hedge positions for this Agreement (the ‘Average Bid Price’) in the applicable NYMEX Futures Contract. The cash payment to be received by the Purchaser shall be an amount equal to the product of the number of gallons represented by the long hedge positions to be liquidated multiplied by the difference between the Average Bid Price for the applicable NYMEX Futures Contract and the Fixed Cash Price. At any time that Purchaser exercises this option, Seller shall, as soon as practicable after receipt of telephonic notice of such elec
 
 *405
 
 tion, liquidate the long hedge positions to the extent of the number of contract units that is equivalent to the number of gallons with respect to which the Purchaser has exercised the option. Purchaser shall promptly provide written confirmation of its telephone notice of such election. Seller does not guarantee that it can liquidate such positions at the bid prices existing at the time Purchaser gives notice that it is exercising this option or even that it can liquidate its positions above the Fixed Cash Price. Upon Purchaser’s receipt of cash payments from Seller representing all of the remaining deliveries of Product, Seller shall have no obligation to deliver any further Product under this Agreement and this Agreement shall terminate.”
 

 “(d) P’or the purpose of this paragraph, the applicable ‘NYMEX Futures Contract’ shall mean the futures contract for the underlying Product as traded on the NYMEX with a delivery month for which the last NYMEX Trading Day falls no earlier than forty-five (45) days and no later than seventy-five (75) days from the date of exercise of the option.”
 

 Thus, the option gave the customer the right to elect to receive a cash payment in lieu of further deliveries if the New York Mercantile Exchange (“NYMEX”) bid price of the relevant futures contract for the specified petroleum product exceeded the flexie contract price. The payment ■was to be equal to the difference between the contract price and the average bid price obtained by MGRM in liquidating its long hedge positions in the applicable NY-MEX futures contract multiplied by the number of gallons of the product not yet delivered under the contract. The purpose of this option allegedly was to protect the parties from the risk of supply shortages and short-term price spikes.
 
 [5]
 

 As is readily apparent, the option clauses in the flexie contracts presupposed, not unreasonably, that MGRM would maintain long hedge positions — positions giving it the right to buy the product it was obliged to deliver to its customers at or near the prices at which it was obliged to sell — in order to avoid the risk of literally open-ended losses that otherwise could have been sustained by MGRM if market prices rose above the contract prices.
 
 [6]
 
 Nevertheless, the flexie contracts did not expressly require MGRM to maintain such hedge positions.
 

 The MG Group Crisis
 

 Soon after these contracts went into effect, the MG Group began to experience financial difficulty.
 
 [7]
 
 In order to reduce its exposure under the flexie contracts and others, MGRM had hedged by purchasing oil futures contracts on the NYMEX and off-exchange derivatives. When oil prices dropped sharply in late 1993, MGRM faced huge margin calls and suffered other short-term losses, plunging the entire conglomerate into a severe liquidity crisis and pushing it to the brink of insolvency. At the last minute, MGAG’s creditors, including Deutsche Bank, stepped in and orchestrated a reorganization and bail out.
 
 [8]
 
 This involved, among other things, financial and managerial restructuring, new lines of credit and, most important for purposes of this motion, liquidation of MG’s hedge positions in the exchange traded and off-exchange derivatives.
 

 The CFTC Settlement
 

 Although MGAG survived the crisis, the legal and regulatory fallout has been sub
 
 *406
 
 stantial. In addition to facing numerous law suits, MGRM apparently became the target of a Commodity Futures Trading Commission (“CFTC”) inquiry. Prior to the institution of any enforcement action, the MGRM submitted an offer of settlement that was accepted by the Commission and resulted in the issuance of a consent order. The uncontested recitals that preceded the decretal portion of the order set forth the Commission’s findings that the contracts here at issue were “illegal off-exchange futures contracts.”
 
 [9]
 
 The decretal portion of the order, to which MGRM explicitly agreed, provided in relevant part that MGRM would cease offering the contracts and promptly notify all purchasers of the contracts that the Commission had found the contracts to be “illegal and void.”
 
 [10]
 
 The order thus arguably relieved MGRM of its obligations under the contracts. And that is the heart of plaintiffs’ grievance. They contend that the MG Group breached its duties to plaintiffs by proposing and entering into a settlement with the CFTC for the express purpose of obtaining a statement that the contracts were void in order to eliminate its exposure to the plaintiffs.
 

 II
 

 Plaintiffs assert the following claims:
 

 • Count I asserts that MGRM breached its duty under the flexie contracts to maintain readiness to deliver the specified products and pay plaintiffs upon exercise of their options by agreeing to the CFTC order declaring the flexies illegal. It seeks to hold MG Corp. and MGAG liable on theories of
 
 respondeat superior
 
 and
 
 alter ego
 
 liability and by piercing MGRM’s corporate veil.
 

 • Count II alleges that MGRM breached the duty of good faith and fair dealing inherent in the flexie contracts by procuring and agreeing to the CFTC order on the theory,
 
 inter alia,
 
 that MGRM proposed language to the CFTC supporting a finding that the flexies were illegal. It asserts this claim against MG Corp. and MGAG also on the theories of liability listed in Count I.
 

 • Count IV
 
 [11]
 
 charges Deutsche Bank with lender liability for the breaches of the flexie contracts on the grounds that Deutsche Bank or its agents (1) ousted members of the management of MGAG, MG Corp. and MGRM with whom it had conflicts, (2) took control of the MG Group’s energy business in the United States, (3) directed that the hedge positions for the flexie contracts be liquidated, (4) directed that the flexies be terminated, and (5) falsely portrayed the flexies as illegal off-exchange futures contracts in communications to the CFTC.
 

 • Count V seeks to hold Deutsche Bank liable for MGRM’s breach of contract on
 
 respondeat superior,
 
 corporate veil piercing and
 
 alter ego
 
 liability theories.
 

 • Count VI alleges that Deutsche Bank breached the duty of good faith and fair dealing inherent in the flexie contracts on the theories of liability listed in Count V.
 

 • Count VII charges Deutsche Bank with tortiously interfering with plaintiffs’ contracts with MGRM by engaging in the acts set forth in Count IV.
 

 Defendants move to dismiss as follows:
 

 The MG Group seeks dismissal of Counts I and II on the ground that the contract claims are time barred. MGAG and MG Corp. argue also that plaintiffs have not pleaded adequately a vicarious liability claim against them.
 
 [12]
 
 In the alter
 
 *407
 
 native, the MG Group moves for summary judgment on Counts I and II against seven plaintiff customers on the ground that each of these plaintiffs either released the claims in suit or gave sworn statements that the contracts had been canceled by mutual consent. Deutsche Bank moves to dismiss Counts IV, V, VI and VII on the grounds that (1) plaintiffs have not stated a vicarious liability claim against it
 
 on the
 
 contract counts, (2) the lender liability and tortious interference claims are legally insufficient, (3) the breach of the duty of good faith and fair dealing claim is duplica-tive of the breach of contract claim, and (4) the tortious interference claim is time barred.
 

 Ill
 

 MG Group’s Motion
 

 A.
 
 Timeliness of the Contract Claims
 

 1. The Applicable Prescriptive Period
 

 The MG Group contends that plaintiffs’ contract claims are governed by a four-year statute of limitations and therefore are time barred. Plaintiffs counter that either the entire contract or at least the cash payment option provision of the contract is governed by a six-year statute of limitations.
 
 [13]
 

 As a general matter, a four-year statute of limitations applies under the New York
 
 [14]
 
 version of the Uniform Commercial Code
 
 [15]
 
 to contracts for the sale of goods and a six-year statute to all other contracts.
 
 [16]
 
 Where the contract at issue contains provisions, some of which are for the sale of goods and some of which are not, the court does not apply different limitations periods to different provisions, as plaintiffs suggest. Rather, the court looks to the “primary purpose” test to determine which statute of limitations applies to the entire contract.
 
 [17]
 
 If the primary purpose of the contract is the sale of goods, the four-year UCC statute of limitations applies to the entire instrument. If the contract primarily is a non-sale of goods agreement, the six-year limitations period applies. This analysis is made in light of the parties’ intent as indicated by the circumstances rather than the content of the four corners of the contract alone.
 
 [18]
 

 The MG Group contends that these contracts are primarily for the sale of goods and therefore are governed by the four year UCC statute of limitations. As the alleged breach was in July 1995 when the MG Group entered into the CFTC settlement, and this action was not commenced until more than four years later, they maintain that the contract claims are barred. And indeed, the contracts on their face appear to be agreements for the sale of goods.
 
 [19]
 
 Nevertheless, plaintiffs dispute this characterization.
 

 
 *408
 
 Plaintiffs argue that the contracts were “hedging” or “risk management” instruments, rather than agreements for the sale of goods, and therefore are subject to the general six-year contract limitations period.
 
 [20]
 
 Their argument draws support from the fact that the CFTC found, in accepting MGRM’s offer of settlement, that “[v]irtually all purchasers entered the ... Agreements with the intent of invoking the ‘blow-out’ provision for the purpose of speculating on the price of the underlying product,”
 
 [21]
 
 thus implying that the purchasers did not intend ever to accept physical delivery.
 

 It is defendants’ burden on this motion to establish that plaintiffs could prove no facts under the amended complaint which would entitle them to relief.
 
 [22]
 
 In view of the possibility that the primary purpose of these contracts may not have been sales of goods, the Court may not now conclude as a matter of law that the four year UCC prescriptive period applies, although of course it may prove applicable on a fuller record.
 

 This alone is sufficient to dispose of the MG Group’s statute of limitations argument. But the result would be the same even if the Court applied the four year prescriptive period.
 

 2. Accrual of the Claim
 

 Assuming that the four year prescriptive period applies, the MG Group claims that the complaint was not timely filed. It acknowledges that plaintiffs’ contract claims are based only on the MG Group’s July 1995 deal with the CFTC, less than four years before the March 1999 filing date. Nonetheless, it argues that the complaint alleges also two earlier breaches— the first in December 1993, when defendants allegedly liquidated their hedge positions on the NYMEX,
 
 [23]
 
 and the second in January 1994, when MGRM sent letters to plaintiffs purporting to confirm mutual cancellation of the flexie contracts.
 
 [24]
 
 It therefore maintains, on each of two independent legal theories, that plaintiffs’ claims on these contracts accrued on one of these dates and therefore expired in either December 1997 or January 1998, well before plaintiffs filed this action.
 

 The first of the MG Group’s arguments is that MGRM’s removal of the hedges breached its contractual obligation to keep the hedges in place and thus set the statute of limitations running for that and any subsequent breach, rendering this action untimely.
 
 [25]
 

 As a general rule, every breach of contract gives rise to a claim for damages.
 
 [26]
 
 If the breach is material and the breaching party fails to cure the breach within a reasonable period of time, the aggrieved party can elect to terminate the contract and claim damages for total breach.
 
 [27]
 
 Where this occurs, the statute of • limitations begins to run for all of the
 
 *409
 
 aggrieved party’s remaining rights to performance.
 
 [28]
 
 In consequence, once the injured party terminates the contract, any action thereunder brought after the expiration of the limitations period is precluded, whether on the provision originally breached or on another provision of the contract.
 

 In contrast, if the breach is not material or if the party aggrieved by a material breach elects not to terminate, the breach is deemed partial, and the contract remains in force.
 
 [29]
 
 In consequence, only those claims arising out of the partial breach accrue at that time.
 
 [30]
 

 In this case, the amended complaint alleges that defendants were obliged to maintain the hedges and that they breached this duty in December 1993.
 
 [31]
 
 Although the existence of such an obligation perhaps is debatable, the Court is obliged on a motion to dismiss to take all well pleaded factual allegations in the complaint as true.
 
 [32]
 
 The Court assumes for purposes of this motion that there was such an obligation and that it was breached in 1993.
 

 Following this alleged breach, plaintiffs apparently made no move to terminate the contracts. Hence, even if removal of the hedges were material breaches,
 
 [33]
 
 they
 
 *410
 
 were not total breaches, as plaintiffs chose not to treat them as such. In consequence, MGRM’s December 1993 removal of the hedges at most was a partial breach that did not trigger the statute of limitations for all of plaintiffs’ remaining rights to performance under the contracts.
 

 The MG Group makes a second argument as to why the statute of limitations began to run in December 1993, when defendants allegedly liquidated the hedges, or January 1994, when MGRM sent letters purporting to confirm cancellation of the contracts. It claims that either or both of these actions constituted an anticipatory repudiation of the contracts and that this repudiation set the statute of limitations running on all subsequent breaches, thus rendering this action untimely.
 
 [34]
 
 This contention ultimately fails as well.
 

 First, removal of the hedges was not an anticipatory repudiation.
 
 [35]
 
 The Of
 
 *411
 
 ficial Comment to the New York Uniform Commercial Code defines anticipatory repudiation as “an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.”
 
 [36]
 
 Defendants’ alleged unwinding of the hedges did neither. That action was susceptible to varying interpretations and, at least as far as the complaint discloses, did not necessarily evidence a clear determination not to deliver under or otherwise breach the contracts. Nor did it make performance impossible. The only conceivable argument on this score is that removal of the hedges made impossible the cash payment under the option provision because calculation of that payment depended on the hedges being in place. As discussed above,
 
 [37]
 
 however, it is not clear at this stage of the proceedings that this was so.
 

 Removal of the hedges fails to qualify as an anticipatory repudiation for a second reason as well. The UCC notes that in order to qualify as an anticipatory repudiation, the performance repudiated must “substantially impair the value of the contract” to the other party.
 
 [38]
 
 In this case, the value of the contracts to plaintiffs at least arguably lay in plaintiffs’ ability to purchase the petroleum product and invoke the option provision, not in defendants’ maintenance of the hedges
 
 per se.
 
 In consequence, it is impossible to say at this juncture that removal of the hedges constituted an anticipatory repudiation.
 

 The same cannot be said of the January 1994 letters. The amended complaint alleges that the letters, sent by MGRM to its flexie contract customers, purported to “confirm our agreement” to cancel the contracts and “relieve both parties of any obligation thereunder.”
 
 [39]
 
 It alleges also that no such agreements had been made.
 
 [40]
 
 Although plaintiffs acknowledge that these statements “in isolation” could “constitute a total repudiation,”
 
 [41]
 
 they argue that extrinsic circumstances, namely the state of “chaos” in which MGRM found itself at the time of the letters, made this conclusion unreasonable.
 
 [42]
 
 In consequence, they contend that the letters do not meet the standard for anticipatory repudiation.
 
 [43]
 

 The Court is unpersuaded. Plaintiffs have not alleged extrinsic circumstances that would have led a reasonable customer to interpret the letters as anything but a clear statement that defendants would not perform under the contracts. Indeed, the facts recited by plaintiffs in the amended complaint suggest precisely the opposite, particularly two January 1994 newspaper reports stating that MGAG was suffering from “extreme financial problems” and “at the edge of insolvency.”
 
 [44]
 
 This information bolsters the only reasonable inference one could have drawn from the letters— that defendants intended to treat the contracts as if they were canceled and thereby deprive plaintiffs of all expected benefits. This clearly meets the standard for anticipatory repudiation.
 

 That the 1994 letters qualify as an anticipatory repudiation, however, is only the beginning of the inquiry, as the parties disagree about the limitations effect of repudiation. The MG Group argues that the
 
 *412
 
 statute of limitations for all of an aggrieved party’s rights under the contract runs from the moment of an anticipatory repudiation.
 
 [45]
 
 It therefore contends that plaintiffs’ claim is time barred because it was brought more than four years after the January 1994 repudiation.
 

 Plaintiffs counter that even if the letters were an anticipatory repudiation, they did not trigger the statute of limitations for subsequent breaches.
 
 [46]
 
 They argue that anticipatory repudiation gives the aggrieved party the option to sue immediately on the repudiation or await performance.
 
 [47]
 
 In the latter case, they claim, the statute of limitations does not begin to run until failure of performance.
 
 [48]
 
 Therefore, plaintiffs argue, they were free not to sue on the letters and are not time barred from bringing a claim based on defendants’ alleged consent to the CFTC order in 1995.
 

 The Code provision on anticipatory repudiation does little to clarify the issue. In relevant part, Section 2-610 permits a party aggrieved by an anticipatory repudiation to (1) await performance “for a commercially reasonable time” or (2) “resort to any remedy for breach.”
 
 [49]
 
 This provision unquestionably gives an aggrieved party the choice to sue or await performance, at least for a “commercially reasonable time.” However, it says nothing about when the statute of limitations begins to run.
 

 This issue has received scant attention, particularly in UCC cases. At common law, a party aggrieved by an anticipatory repudiation was not required to sue immediately but could await the time of performance to see whether the other party intended to make good on its repudiation.
 
 [50]
 
 In consequence, the statute of limitations for failure to perform did not begin to run until the time fixed for performance.
 

 The UCC appears to have adopted this approach, although it does not explicitly so state. The Official Comment to Section 2-610 states that “the aggrieved party is left to proceed
 
 at any time
 
 with his options under this section” and provides that “[fin-action and silence by the aggrieved party ... cannot be regarded as misleading the repudiating party.”
 
 [51]
 
 Further, although the statute gives the aggrieved party the option to await performance for a “commercially reasonable time,” rather than indefinitely, the Official Comment suggests that this provision merely creates a requirement to mitigate damages
 
 [52]
 
 rather than imposing an earlier start date for the statute of limitations. These comments contravene the MG Group’s contention that, in the context of anticipatory repudiation, the UCC favors a policy of repose for the repudiating party rather than choice for the aggrieved party.
 
 [53]
 
 Indeed, they suggest precisely the opposite conclusion— that under the UCC an aggrieved party is free to await performance following an anticipatory repudiation. This reading of the statute is borne out as well by the case law
 
 [54]
 
 and scholarly commentators.
 
 [55]
 
 In
 
 *413
 
 consequence, defendants’ January 1994 anticipatory repudiation did not start the statute of limitations running on the entire contract and thereby render Counts I and II untimely.
 

 Plaintiffs’ action may not be dismissed as time barred, at least at this juncture, for another reason as well. Even if defendants’ January 1994 anticipatory repudiation commenced the prescriptive period with respect to all claims on the contract, a March 1994 letter from defendants to plaintiffs appears to have retracted the anticipatory repudiation and reinstated the
 
 status quo ante.
 
 Section 2-611 of the UCC permits a party to retract an anticipatory repudiation “by any method which clearly indicates to the aggrieved party that the repudiating party intends to perform.”
 
 [56]
 
 This option is open to the repudiating party at any time “before its next performance is due” unless “the aggrieved party has since the repudiation canceled or materially changed his position or otherwise indicated that he considers the repudiation final.”
 
 [57]
 
 Once made, a
 
 *414
 
 retraction “reinstates the repudiating party’s rights under the contract”
 
 [58]
 
 and restores “the relation between the parties ... before the repudiation was made,”
 
 [59]
 
 effectively nullifying the repudiation.
 

 In this case, the amended complaint alleges that on March 3,1994, MGRM sent a letter to its customers in which it “con-fírmfed] [MGAG’s] commitment to [MGRM’s] business.”
 
 [60]
 
 It enclosed a letter, from MGAG to the customers in which MGAG outlined its efforts to provide financial stability to MG Corp. and affirmed its commitment to help “MG continue to hon- or all contractual obligations.”
 
 [61]
 
 These statements certainly are susceptible of the interpretation that defendants intended to perform their contractual obligations. In consequence, even if defendants’ anticipatory repudiation had triggered the statute of limitations for all actions under the contract, plaintiffs have pleaded adequate facts to support a finding that the March 3 letters retracted the anticipatory repudiation and reinstated the contracts.
 
 [62]
 
 Accordingly, the MG Group’s motion to dismiss Counts I and II as time barred is denied.
 

 B.
 
 Vicarious Liability of MGAG and MG Corp.
 

 MGAG and MG Corp. move also to dismiss Counts I and II of the amended complaint as against them on the ground that plaintiffs fail allege facts sufficient to hold them liable for the actions of their subsidiary, MGRM. This argument is unpersuasive.
 

 Plaintiffs seek to hold MGAG and MG Corp. liable for breach of the flexie agreements, to which only MGRM was a signatory, on
 
 respondeat superior
 
 and
 
 alter ago
 
 theories as well as by piercing MGRM’s corporate veil. The Court need find only that plaintiff has pleaded adequately one of these three theories in order to deny this aspect of the motion to dismiss.
 

 In order to pierce the corporate veil on a contract claim, plaintiffs must show (1) complete domination of the corporation with respect to the transaction at issue, and (2) that such domination was used to commit a fraud or wrong against the aggrieved party.
 
 [63]
 
 Plaintiffs easily satisfy both requirements of this standard. The amended complaint alleges that MGAG is the sole shareholder of MG Corp.;
 
 [64]
 
 MG Corp. is the sole shareholder
 
 *415
 
 of MGRM;
 
 [65]
 
 the funds of MGAG, MG Corp. and MGRM were commingled;
 
 [66]
 
 MGAG financed MG Corp.’s and MGRM’s debts;
 
 [67]
 
 the operations of MGAG, MG Corp. and MGRM were not separate;
 
 [68]
 
 and corporate formalities were not followed as among the three entities.
 
 [69]
 
 They allege further that MGAG supervised and financially assisted MG Corp. and MGRM in connection with MGRM’s performance under the supply contracts,
 
 [70]
 
 including a guarantee by MGAG securing all of the MG Group’s futures trades and obligations;
 
 [71]
 
 MGAG and Deutsche Bank representatives stripped MGRM’s president of responsibility for the hedge positions;
 
 [72]
 
 and MGAG directed its agents, including MG Corp. and MGRM, to provide false information to the CFTC, to encourage the CFTC to issue untrue findings, and to consent to the CFTC order declaring the contracts illegal.
 
 [73]
 
 Additionally, it alleges two communications among MGAG, MG Corp. and plaintiff customers that further suggest domination by these entities of MGRM — the first, a letter to the customers from the president of MG Corp. indicating that MGRM’s president had been fired,
 
 [74]
 
 and the second, a letter to the customers from MGAG in which it discussed its “position with respect to MG Corp.’s and [MGRM’s] future in the petroleum supply business,” enumerated measures taken by MGAG to protect the financial stability of MG Corp. and help the MG Group honor “all contractual obligations,” and assured the customers that MG had the appropriate hedges in place.
 
 [75]
 

 These allegations suggest not only domination, but also use of this domination by MGAG and MG Corp. to commit a wrong against plaintiffs. The essence of plaintiffs’ complaint is that the MGAG and MG Corp. acted to extricate MGRM from the flexie contracts by,
 
 inter alia,
 
 taking control of MGRM, ousting its management, unwinding the hedges, misleading plaintiffs into inaction, providing the CFTC with false information, and consenting to the 1995 CFTC order declaring the flexie contracts illegal. The amended complaint thus alleges facts sufficient to support a finding that MGAG and MG Corp. used their domination of MGRM to commit these wrongs against plaintiffs. The motion to dismiss Counts I and II as against MGAG and MG Corp. on this ground is denied.
 

 C.
 
 Releases and Cancellations
 

 The MG Group moves in the alternative for summary judgment dismissing Counts I and II as against seven plaintiff customers on the ground that they gave complete releases or signed sworn statements that the flexies had been canceled by mutual consent.
 
 [76]
 
 Plaintiffs dispute both claims.
 

 
 *416
 

 1. Releases
 

 The MG Group points first to releases allegedly signed by plaintiffs Corbin Fuel Co., Ports Petroleum Company, Inc., Ferrell Fuel Company Inc. and Fox Fuel Co. The releases specify particular contracts to be canceled, which do not include the flexies, and then purport to release defendants from liability
 
 for all claims against
 
 MGRM,
 
 “including without limitation”
 
 any claim arising from the specified contracts.
 
 [77]
 
 As no limitation is evident from the face of the releases, the MG Group argues that the releases reach more broadly than the specified contracts and release MGRM from all claims against it, including those brought in this case.
 

 Although plaintiffs do not dispute having signed the releases, they argue that the releases applied to specified contracts only and did not cover the flexies.
 
 [78]
 
 They have submitted declarations by their principals to the effect that the releases were signed at MGRM’s request in connection with the mutual cancellation of the contracts specified in each release and that they did not intend the releases to cover anything but those specified contracts. Further, plaintiffs attached to two of these declarations letters from MGRM to the declarants which appear to have been enclosed with the releases and in which MGRM stated explicitly that the releases applied to the specified contracts.
 
 [79]
 

 The New York Court of Appeals has noted that language of general release must be treated with particular care and must yield to the purpose for which the release is given, the parties’ intent and other attendant circumstances.
 
 [80]
 
 As plaintiffs have submitted evidence that the parties did not intend a general release, the MG Group’s motion for summary judgment on Counts I and II as against Corbin Fuel Co., Ports Petroleum Company, Inc., Ferrell Fuel Company Inc. and Fox Fuel Co. is denied.
 

 2. The Sworn Statements
 

 The MG Group points next to sworn statements 'signed by principals of plaintiffs Merritt Oil Co., Higginson Oil Co. and RK Distributing, Inc. stating that the flexie contracts had been canceled by mutual consent. Plaintiffs dispute the legal effect of the sworn statements on two grounds.
 
 [81]
 

 First, plaintiffs argue that defendants deceived them about the legal status of the contracts and misled them into signing the statements.
 
 [82]
 
 As plaintiffs have submitted declarations by the three plaintiffs to this effect, they have raised an issue of material fact that precludes summary judgment.
 

 Plaintiffs contend alternatively that the sworn statements are without legal effect because the flexie contracts included a no oral modification clause.
 
 [83]
 
 They point out that the sworn statements themselves are
 
 *417
 
 not instruments of cancellation, but merely attest to a prior, apparently unwritten, agreement to cancel.
 
 [84]
 
 As the flexies, by their own terms, cannot be modified by such an agreement, the agreements attested to in the sworn statements are of no effect.
 
 [85]
 
 Accordingly, summary judgment on Counts I and II as against Merritt Oil Co., Higginson Oil Co. and RK Distributing, Inc. is denied.
 

 IV
 

 The Deutsche Bank Motion
 

 A.
 
 Vicarious Liability
 

 Deutsche Bank moves to dismiss Counts V and VI of the amended complaint on the ground that plaintiffs fail to allege facts sufficiently to hold Deutsche Bank liable for the actions of MGAG, MG Corp. and MGRM. The Court finds this contention unpersuasive.
 

 As with their claims against MG Corp. and MGAG, plaintiffs contend that Deutsche Bank is liable on the contract counts on theories of corporate veil piercing,
 
 respondeat superior
 
 and
 
 alter ego
 
 liability. They allege that Deutsche Bank AG was a controlling shareholder
 
 of
 
 MGAG;
 
 [86]
 
 the chair of MGAG’s supervisory board was a member of Deutsche Bank AG’s management board and oversaw Deutsche Bank New York;
 
 [87]
 
 through MGAG, Deutsche Bank financed MG Corp.’s and MGRM’s debts;
 
 [88]
 
 Deutsche Bank commingled its funds with MGAG, MG Corp. and MGRM;
 
 [89]
 
 the operations of Deutsche Bank, MGAG, MG Corp. and MGRM were not separate;
 
 [90]
 
 and corporate formalities among the entities were not followed.
 
 [91]
 
 They allege further that Deutsche Bank and MGAG supervised and financially assisted MG Corp. and MGRM in connection with their performance under the supply contracts;
 
 [92]
 
 the board member common to Deutsche Bank AG and MGAG and other Deutsche Bank agents oversaw MG’s energy business, including the flexie contracts;
 
 [93]
 
 the same board member fired two-thirds of MGAG’s management board, including the chief executive officer of MGAG and MG Corp.;
 
 [94]
 
 the firings took place at Deutsche Bank’s offices;
 
 [95]
 
 Deutsche Bank and MGAG fired MG Corp.’s Chief Operating Officer
 
 [96]
 
 and required all personnel in MG Corp.’s New York office to report the CEO of Deutsche Bank North America and a Deutsche Bank consultant hired by the common board member;
 
 [97]
 
 Deutsche Bank and MGAG stripped MGRM’s president of responsibility for the hedge positions and gave this responsibility to the Deutsche Bank consultant;
 
 [98]
 
 and the Deutsche Bank consultant directed MGRM to send the January 1994 letter to customers repudiating the
 
 *418
 
 contracts.
 
 [99]
 
 "
 

 Unlike MGAG and MG Corp., Deutsche Bank is alleged to be merely a controlling shareholder rather than a- parent company with 100 percent ownership interest. For this reason, the sufficiency of plaintiffs’ contract allegations against Deutsche Bank is a slightly closer question than is the case with respect to its allegations against MGAG and MG Corp. Nonetheless, plaintiffs plead numerous facts that, if established at trial, would show substantially complete domination of the MG Group by Deutsche Bank.
 

 Deutsche Bank, perhaps recognizing the strength of the allegations of domination and control, rejoins that plaintiffs’ assertions focus on the 1993-94 time period, whereas the breach of contract complained of is the July 1995 deal between MGRM and the CFTC. It maintains that there is no basis for suggesting that Deutsche Bank controlled MGRM with respect to that alleged breach. But Deutsche Bank reads the complaint too narrowly. The essence of plaintiffs’ argument is that Deutsche Bank was deeply implicated in the management of the MG Group in general and the flexie contracts in particular, that it ousted much of the MG Group’s management and replaced it with its own designee when it became concerned about its exposure in the petroleum futures area, and that it actively sought to extricate the MG Group from the hedge positions and the flexie contracts. Were plaintiffs to prove all of this, surely they reasonably could argue to the trier of fact that Deutsche Bank must have been involved in the decision to enter into the CFTC deal in light of both its past actions with respect to the MG Group and the fact that the CFTC deal so neatly served the goal that Deutsche Bank was seeking to attain. In consequence, the complaint is entirely sufficient in alleging that Deutsche Bank dominated and controlled the MG Group with respect to the transaction at issue and that it used that control to commit a wrong against plaintiffs by consenting to a CFTC order prohibiting MGRM from performing under the contracts with plaintiffs. Deutsche Bank’s motion to dismiss Counts V and VI on the ground that they do not sufficiently allege a basis for its liability is denied.
 

 B.
 
 Lender Liability
 

 Deutsche Bank moves also to dismiss Count IV, the lender liability claim, on the ground that plaintiffs have failed to plead a basis for imposing liability upon it.
 

 Lender liability is not an independent cause of action, but a term that refers to the imposition of traditional contract or tort liability on a bank or other financial institution.
 
 [100]
 
 It may be predicated on,
 
 inter alia,
 
 breach of contract, breach of fiduciary duty, common law fraud, duress, tortious interference with contract, defamation or negligence.
 
 [101]
 

 Plaintiffs here seek recovery against Deutsche Bank for MGRM’s breach of contract on both vicarious liability and tor-tious interference theories. To the extent there is basis for such claims, plaintiffs will prevail. But the stand-alone “lender liability” claim is entirely duplicative. Accordingly, Count IV will be dismissed.
 

 C.
 
 Breach of the Implied Covenant of Good Faith and Fair Dealing
 

 Deutsche Bank moves also to dismiss Count VI, the claim for breach of the implied covenant of good faith and fair dealing, on the ground that it is duplicative
 
 *419
 
 of the contract claim.
 
 [102]
 

 Under New York law, a claim for breach of the implied covenant will be dismissed as duplicative if the conduct allegedly violating the implied covenant is also the predicate for breach of the underlying contract.
 
 [103]
 
 Plaintiffs attempt to distinguish the factual allegations underlying the two claims,
 
 [104]
 
 but their effort is unavailing. Both counts clearly rest on the same factual predicate — Deutsche Bank’s alleged involvement in the 1995 CFTC order. In consequence, Count VI of the amended complaint is dismissed as duplicative.
 

 D.
 
 Tortious Interference Claim
 

 Deutsche Bank moves to dismiss Count VII, the claim for tortious interference with contract, on the grounds that it fails to state a claim upon which relief may be granted and is time barred in any case. As the Court agrees that the claim is untimely, there is no need to address its legal sufficiency.
 

 Under New York law, a three-year statute of limitations applies to plaintiffs’ claim for tortious interference with contract.
 
 [105]
 
 In this case, Deutsche Bank argues, and plaintiffs implicitly concede, that this claim accrued on July 27, 1995, when the CFTC order was entered.
 
 [106]
 
 Deutsche Bank contends that the statute of limitations on this claim therefore expired in July 1998, more than seven months before plaintiffs filed the original complaint in this action. Plaintiffs, however, argue that the limitations period was equitably tolled because Deutsche Bank concealed its role in procuring the order.
 
 [107]
 

 The doctrine of equitable tolling to which plaintiffs appeal is federal in nature and does not apply to claims based solely on New York law.
 
 [108]
 
 New York, however, recognizes the related but not identical doctrine of equitable estoppel, which bars a defendant from pleading the statute of limitations “where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action.”
 
 [109]
 
 Application of this doctrine requires defendant to have engaged in affirmative acts of misrepresentation or concealment, rather than mere passive failure to disclose facts.
 
 [110]
 
 It further requires plaintiff to
 
 *420
 
 demonstrate that it exercised due diligence in bringing the cause of action and reasonable care in ascertaining facts which might have led to discovery of plaintiffs claim.
 
 [111]
 

 In this case, plaintiffs have met none of these requirements. The amended complaint fails to plead any affirmative act of concealment or misrepresentation by Deutsche Bank other than the conclusory allegation that Deutsche Bank “concealed” its role in the “unlawfully-induced breaches” of the flexie agreements.
 
 [112]
 
 Nor does it affirmatively plead diligence in ascertaining the facts and bringing the claim. To the contrary, it simply asserts that plaintiff did not know of the cause of action until the fall of 1997 and that it commenced the action in March 1999. In consequence, plaintiffs have failed to allege the elements of equitable estoppel, and Count VII of the amended complaint therefore is dismissed.
 

 V
 

 For the foregoing reasons, the motion by the MG Group to dismiss Counts I and II or, in the alternative, for summary judgment dismissing the claims of certain plaintiffs is denied in all respects. Count III is dismissed on consent. The motion by the Deutsche Bank defendants to dismiss is granted to the extent that Counts IV, VI and VII are dismissed and denied in all other respects.
 

 SO ORDERED.
 

 [1]
 

 . Unless distinction is made, defendants Deutsche Bank AG, Deutsche Bank North America, and Deutsche Bank New York will be referred to collectively as "Deutsche Bank."
 

 [2]
 

 . Am. Cpt. ¶¶ 39-54. The amended complaint fails to mention a starting date for six of the 22 of the contracts at issue.
 
 Id.
 
 ¶¶ 55-60.
 

 [3]
 

 . Firm Fixed Price (45 Day) Agreement Contract for Sale of Petroleum Products ("Contract” or "Flexie”) (Taylor Aff. Ex. 1; Ludwig Aff. Ex. B (PI. Response to MGRM and MG Corp.’s Rule 56.1 Stmt. Ex. 8)).
 

 [4]
 

 . Contract ¶ 16.
 

 [5]
 

 . Am. Cpt. ¶¶ 35-36.
 

 [6]
 

 . Indeed, the contracts perhaps presupposed that MGRM would hedge by entering into back-to-back purchase contracts in order to ensure its ability to deliver the physical commodity if the blow out options were not exercised as opposed to relying on spot market purchases to satisfy its delivery obligations.
 

 [7]
 

 .
 
 Id.
 
 ¶¶ 66-82.
 

 [8]
 

 .
 
 Id.
 
 ¶¶ 67-90.
 

 [9]
 

 .
 
 MG Refining and Marketing, Inc.,
 
 CFTC Docket No. 95-14, 1995 WL 447455,
 
 *2,
 
 *6 (July 27, 1995).
 

 [10]
 

 .
 
 Id.
 
 at *8.
 

 [11]
 

 . Plaintiffs have dropped Count Ill. PL Mem. in Opp. to MG Parties at 1 n.l.
 

 [12]
 

 . This issue was not raised by the MG Group until its reply memo. MG Group Repl. Mem. at 7-8. As Deutsche Bank raised the same issue in its motion to dismiss, howev
 
 *407
 
 er, plaintiffs had an opportunity to respond and would suffer no prejudice. Accordingly, the Court will consider the argument.
 

 [13]
 

 . Although plaintiffs did not assert this argument in their original motion papers, they did so in a previous set of motion papers filed in May.
 
 PL
 
 Mem in Opp. to MG Group, filed May 25, 1999, at 11 n.2. As plaintiffs specifically requested in their reply papers and at. oral argument that, this claim be preserved, MG Group Repl. Mem. at 7-8; Tr. at 7, and as defendants will suffer no prejudice, the Court will consider it.
 

 [14]
 

 . The parties agree that this case is governed by New York law.
 

 [15]
 

 . N.Y. UNIF. COMM. C. § 2-725 (McKinney 1990).
 

 [16]
 

 . N.Y. CIV. PRAC. L. & R. ("CPLR”) § 213 (McKinney 1990).
 

 [17]
 

 .
 
 See Insurance Co. of North America v. ABB Power Generation, Inc.,
 
 925 F.Supp. 1053 (S.D.N.Y.1996).
 

 [18]
 

 .
 
 See, e.g., Dynamics Corp. of America v. International Harvester Co.,
 
 429 F.Supp. 341, 346 (S.D.N.Y. 1977);
 
 Curtis Publishing Co. v. Sheridan,
 
 53 F.R.D. 642, 644 (S.D.N.Y.1971).
 

 [19]
 

 . Contract ¶ 16. On a motion to dismiss, the court may consider the complaint and any document attached as an exhibit or incorporated bv reference.
 
 See Goldman v. Belden,
 
 754 F.2d 1059, 1065-66 (2d Cir.1985);
 
 Piccoli A/S v. Calvin Klein Jeanswear,
 
 19 F.Supp.2d 157, 162 n. 25 (S.D.N.Y. 1998);
 
 *408
 

 Mason Tenders District Council Welfare Fund v. Logic Construction Corp.,
 
 7 F.Supp.2d 351, 355 n. 15 (S.D.N.Y.1998). As the amended complaint makes frequent reference to the contract, the Court may properly consider it on the motion to dismiss without converting the motion into one for summary judgment.
 

 [20]
 

 . Pl. Mem. in Opp. to MG Parties, filed May 25, 1999, at 11 n.2.
 

 [21]
 

 .
 
 MG Mining and Marketing, Inc.,
 
 1995 WL 447455, at *3.
 

 [22]
 

 .
 
 Conley v. Gibson,
 
 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).
 

 [23]
 

 . Am. Cpt. ¶ 71.
 

 [24]
 

 .
 
 Id.
 
 ¶ 85.
 

 [25]
 

 . MG Group Mem. at 9-11 (citing Am. Cpt. ¶¶ 61-62, 71); MG Group Repl. Mem. at 1 (citing Am. Cpt. ¶ 110).
 

 [26]
 

 . Restatement (Second) Of Contracts § 236, cmt. a (1981).
 

 [27]
 

 . 2 E. Allan Farnsworth, Farnsworth On Contracts §§ 8.15, 8.16, 8.18 (1998);
 
 Lovink v. Guilford Mills, Inc.,
 
 878 F.2d 584, 586 (2d Cir.1989) (“A total breach justifies termination of the contract and damages for complete failure of performance; a partial breach does not.”).
 

 [28]
 

 .
 
 See generally
 
 2 Farnsworth § 8.15; Restatement (Second) Of Contracts § 236(1).
 

 [29]
 

 . 2 Farnsworth § 8.16; Restatement (Second) Of Contracts § 236, cmt. b.
 

 [30]
 

 .
 
 See generally
 
 2 Farnsworth § 8.15; Restatement (Second) Of Contracts § 236(2) & cmt. b.
 

 [31]
 

 . Am. Cpt. ¶ 61.
 

 [32]
 

 .
 
 See, e.g., Mills
 
 v.
 
 Polar Molecular Corp.,
 
 12 F.3d 1170, 1174 (2d Cir.1993);
 
 L.L. Capital Partners, L.P. v. Rockefeller Center Properties, Inc.,
 
 921 F.Supp. 1174, 1176 (S.D.N.Y.1996). Whether MGRM was obliged contractually to maintain the hedges is actually a mixed question of fact and law, rather than a pure question of fact, and it is true that on a motion to dismiss, the court need not take the legal conclusions in the complaint as true.
 
 See Sirna v. Prudential Securities Inc.,
 
 No. 95 Civ. 8422(LAK), 1997 WL 53194, *2 (S.D.N.Y. Feb. 10, 1997). However, assuming that plaintiffs’ factual allegations concerning the scope of the agreements are con ect, the legal standard is met. The amended complaint states that "it was understood and agreed that MG would have to enter into appropriate transactions on the futures and over-the-counter markets.” Am. Cpt. ¶ 61. Although it does not specify whether this alleged understanding was implicit in the flexie contracts or stemmed from a separate oral agreement between the parties, this ultimately is of no consequence, as in either case, the Court may interpret the contract in light of this alleged understanding.
 

 The parol evidence rule generally prohibits consideration of extrinsic evidence to vary, contradict, explain or add to the plain meaning of a fully integrated contract such as the flexies, which contain integration clauses.
 
 See Investors Ins. Co. of America v. Dorinco Reinsurance Co.,
 
 917 F.2d 100, 104 (2d
 
 Civ. 1990); Trans Pacific Leasing Corp.
 
 v.
 
 Aero Micronesia Inc.,
 
 26 F.Supp.2d 698, 705-06 (S.D.N.Y. 1998). However, if the contract is ambiguous as to any of its terms, parol evidence is admissible to resolve the ambiguity.
 
 Id.
 
 The flexies are ambiguous as to whelher MGRM was required to maintain long hedge positions.
 
 See supra
 
 note 6 and accompanying text. Therefore, even if the understanding alleged in the amended complaint stemmed from a separate oral agreement between the parties, the Court may resolve the contractual ambiguity regarding MGRM's obligation to maintain the hedges in light of this understanding. In consequence, for purposes of this motion to dismiss only, the Court accepts plaintiffs’ allegation that the parties understood that the hedges would be maintained and concludes that this obligation constituted part of the flexie contracts.
 

 [33]
 

 . A material breach is defined as one that is "significant enough to amount to the nonoccurrence of a constructive condition of exchange.” 2 Farnsworth § 8.16. Whether removal of the hedges, assuming it to be a breach at all, rises to such a level is unclear.
 

 The hedges appear to have been significant to these agreements in at least two respects. As noted above, they may have protected the buyers by securing MGRM's ability deliver physical product
 
 in the
 
 face of shortage and, in the event the blow-out options were exercised, by tending to protect its financial stability. More directly, the terms of the contracts measured the amounts payable upon exercise of the blow-out options
 
 *410
 
 as a function of the average bid prices obtained by MGRM in liquidating the hedges upon exercise of the options.
 

 MGRM's primary obligations under the contracts were delivery of the physical product or, upon exercise of the options, payment of the sums required. The significance of the removal of the hedges to the ability of MGRM to perform these obligations cannot be determined on the pleadings. The Court cannot assume that MGRM would have been unable, absent the hedge positions, to secure physical product in sufficient quantity to satisfy its obligations to make physical delivery even in the tightest petroleum market. Nor may it assume that its financial position when the contracts were concluded made its ability to perform with respect to the exercise of the blow-out options in any reasonably foreseeable scenario questionable in the absence of the hedges.
 

 The significance of the removal of the hedges to the calculation of the payments required in the event of exercise of the blowout options is somewhat more troublesome. Given the removal of the hedges, it manifestly would have been impossible to determine the required payments in precise accordance with the contracts; the required payments in that event would have been the difference between the average bid prices secured by MGRM in unwinding the hedges and the contract prices, multiplied by the volume of undelivered product, but there were no hedges left to be unwound after 1993. Yet it is not clear that this alone establishes that the removal of the hedges was a material breach of the contracts.
 

 For one thing, one arguably would have to take into account the likelihood that, the blow-out options would be exercised. Even more basically, it is not self evident that one could not have computed the amounts due under the option clauses by some determination of the prices that MGRM would have secured in unwinding the hedges, assuming that the hedges were unwound at the time of the exercise of the options rather than in late 1993. One conceivably might have looked, for example, to the bid prices on the NYMEX for the relevant futures contracts at the time the options were exercised rather than at average bid prices actually secured by MGRM. On the other hand, this may not have been feasible, as MGRM’s hedge positions might have consisted of contracts maturing earlier than any exercise of the blowout options that MGRM might have rolled forward at indeterminable times and at indeterminable costs.
 

 Given all of the uncertainties, it is impossible to determine as a matter of law, simply on the basis of the pleadings, whether removal of tire hedges in late 1993 was a material breach.
 

 [34]
 

 . MG Group Mem. at 11-15; MG Group Repl. Mem. at 3-5. The theory that removal of the hedges constituted an anticipatory repudiation is at odds with the MG Group’s earlier contention that removal of the hedges was a breach, as the latter is based on the assumption that maintenance of the hedges was required under the contract, and the former necessarily is based on the opposite assumption. However, as parties are permitted to plead in the alternative, the Court will consider both arguments.
 

 [35]
 

 . It is unclear from plaintiffs' submissions and statements at oral argument whether they view removal of the hedges and/or the January 1994 letters as anticipatory repudiations. At one point in their papers, plaintiffs describe these actions as "at most, anticipatory breaches.” Pl. Mem. in Opp. to MG Group at 11. They state two pages later that the 1994 letters "qualified as an anticipatory repudiation under N.Y. U.C.C. § 2-610.”
 
 Id.
 
 at 13. At oral argument, plaintiffs' counsel retreated from this position when he protested defendants’ "misconception” that plaintiffs had acknowledged the letters to be an anticipatory repudiation and later stated that the
 
 *411
 
 letters "did not constitute an anticipatory repudiation under the law.” Tr. at 8-10. Nevertheless, the Court is obliged to give the non-moving parties the benefit of the doubt on a motion to dismiss.
 

 [36]
 

 . N.Y. UNIF. COMM. C. § 2-610, Official Comment 1 (McKinney 1993).
 
 See also Holford U.S.A. Ltd. v. Cherokee, Inc.,
 
 864 F.Supp. 364, 373 n. 12 (S.D.N.Y.1994).
 

 [37]
 

 .
 
 See supra
 
 note 33.
 

 [38]
 

 . N.Y. Unif. Comm. C. § 2-610.
 

 [39]
 

 . Am. Cpt. ¶ 85.
 

 [40]
 

 .
 
 Id.
 

 [41]
 

 . Tr. at 12.
 

 [42]
 

 . Tr. at 9.
 

 [43]
 

 . Tr. at 8-10.
 

 [44]
 

 . Am. Cpt. ¶ 80.
 

 [45]
 

 . MG Group Mem. at 11-15.
 

 [46]
 

 . Pi. Mem. in Opp. to MG Group at 13-15.
 

 [47]
 

 .
 
 Id.
 

 [48]
 

 .
 
 Id.
 

 [49]
 

 . N.Y. Unif. Comm. C. § 2-610(a)-(b).
 

 [50]
 

 .
 
 See Ga Nun v. Palmer,
 
 202 N.Y. 483, 96 N.E. 99 (1911); 4 Arthur Linton Corbin, Corbin On Contracts § 989 (1951 & Supp. 1999).
 

 [51]
 

 . N.Y. Unif. Comm. C. § 2-610, Official Comment 4 (McKinney 1993) (emphasis added).
 

 [52]
 

 . The Official Comment states that "if [the aggrieved party] awaits performance beyond a commercially reasonable time he cannot recover resulting damages which he should have avoided.” N.Y. UNIF. COMM. C. § 2-610, Official Comment 1. This suggests that actions brought after a commercially reasonable time are not time barred, but merely involve limits on recovery.
 

 [53]
 

 . Tr. at 4-5, 23-25.
 

 [54]
 

 .
 
 See G.N. Rupe v. Triton Oil & Gas Corp.,
 
 806 F.Supp. 1495 (D.Kan.1992) (gas purchase contract).
 
 Cf. Ediciones Quiroga, S.L. v. Fall River Music, Inc.,
 
 93 Civ. 3914, 1995 WL 366287, *2 (S.D.N.Y. June 20, 1995)
 
 *413
 
 (non sale of goods agreement);
 
 Sven Salen AB v. Jacq. Pierot, Jr., & Sons, Inc.,
 
 559 F.Supp. 503, 506 (S.D.N.Y.1983) (non sale of goods agreement);
 
 Rachmani Corp. v. 9 East 96th St. Apt. Corp.,
 
 211 A.D.2d 262, 629 N.Y.S.2d 382, 384
 
 (1st
 
 Dept.1995) (non sale of goods agreement);
 
 Police Benev. Ass’n of New York State Police v. State,
 
 79 Misc.2d 334, 336, 358 N.Y.S.2d 280, 283 (Ct.Cl. 1974) (non sale of goods agreement); 1 Weinstein, Korn & Miller, New York Civil Practice ¶ 213.10, at 2-345 (1999); 75 N.Y. Jur.2D,
 
 Limitations
 
 § 161 (1989).
 
 But see American Cyanamid Co. v. Mississippi Chemical Corp.,
 
 817 F.2d 91 (11th Cir.1987) (contract for purchase of phosphate rock). The MG Group cites several cases that hold that an anticipatory repudiation is a breach of contract regardless of whether it is accepted as such by the aggrieved party. MG Group Repl. Mem. at 5 n.5 (citing
 
 William B. Tanner Co. v. WIOO, Inc.,
 
 528 F.2d 262 (3d Cir.1975);
 
 Sawyer Farmers Coop. Assoc, v. Linke,
 
 231 N.W.2d 791 (N.D.1975)). From this premise, it argues that an anticipatory repudiation triggers the statute of limitations for all actions on the contract, regardless of whether the aggrieved party wishes to ignore the repudiation and await performance. These cases are quoted out of context and their doctrine misapplied. In each, the plaintiff brought suit for anticipatory repudiation, and defendant moved to dismiss on the ground that the repudiation was not formally accepted as such by the aggrieved party and therefore did not constitute a breach giving rise to a cause of action. Both courts rejected this argument on the ground that an aggrieved party is not obliged to accept the repudiation formally before bringing suit. These cases thus are about the formal prerequisites to a claim based upon an anticipatory repudiation. Neither speaks to the issue of whether an aggrieved party may elect to ignore an anticipatory repudiation and await performance.
 

 [55]
 

 . Professor Anderson, for instance, asserts that "[ujnder the Code, the view held by some pre-Code courts is continued by which an anticipatory repudiation is not a breach of the contract unless it is so accepted by the [aggrieved party]. Consequently, if the party who could complain does not choose to do so the contract continues in force as before.” 4 Ronald A. Anderson, Uniform Commercial Code § 2-610:18, at 235 (3d ed.1983). He contends further that "[a]n anticipatory breach gives the other party a cause of action for damages which may be sued on immediately or at the time for performance by the party committing the breach.”
 
 Id.
 
 § 2-610:17(5), at 2.35. Although Anderson states also that "[wjhen a party has made an anticipatory repudiation, the statute of limitations commences to run from that date,” this appears to refer to the statute of limitations merely for claims based on the anticipatory repudiation, rather than that for actions based on future breach by nonperformance.
 
 Id.
 
 at § 2-610:3, at 227.
 

 White and Summers likewise appear to interpret Section 2-610 as merely giving the aggrieved party the option to sue before performance is due, rather than obliging that party to take action on the anticipatory repudiation or forego its rights under the contract.
 
 See
 
 I James J. White & Robert S. Summers, Uniform Commercial Code § 6-7, at 336-47 (4th ed.1995). They agree also that if an aggrieved party awaits performance for more than a "commercially reasonable time,” it probably loses only the right to cover and consequential damages, not the right to sue on the contract.
 
 Id.
 
 § 6-7, at 344-45.
 

 [56]
 

 . N.Y. Unif. Comm C. § 2-611(2).
 

 [57]
 

 .
 
 Id.
 
 § 2-611(1).
 

 [58]
 

 .
 
 Id.
 
 § 2-611(3).
 

 [59]
 

 . 4 Anderson § 2-611:6.
 

 [60]
 

 . Am. Cpt. ¶ 87.
 

 [61]
 

 .
 
 Id.
 

 [62]
 

 . The MG Group refers to two cases that allegedly stand for the proposition that the repudiating party must state expressly that its prior repudiation of the contract is withdrawn in order to retract the repudiation. MG Group Repl. Mem. at 5-6 (citing
 
 L. Albert & Son v. Armstrong Rubber Co.,
 
 178 F.2d 182, 186 (2d Cir.1949);
 
 Aero Consulting Corp. v. Cessna Aircraft Co.,
 
 867 F.Supp. 1480, 1492-93 (D.Kan.1994)). It therefore argues that its repudiation of the contracts in January 1994 could not have been withdrawn by the March 1994 letters. MG Group Repl. Mem. at 6. It is mistaken. Its cases state merely that a communication consistent with the intent to proceed with the contract is insufficient to retract a repudiation and that a retraction is valid only if it states clearly the repudiating party’s intention to perform.
 
 Aero Consulting Corp.,
 
 867 F.Supp. at 1486;
 
 L. Albert & Son,
 
 178 F.2d at 191. As the March 1994 letters arguably manifested defendants' unambiguous intention to perform their contractual obligations, these cases do not undermine the Court’s conclusion that the letters at least raise an issue of fact as to whether defendants retracted their anticipatory repudiation.
 

 [63]
 

 .
 
 See, e.g., American Fuel Corp. v. Utah Energy Development Co.,
 
 122 F.3d 130, 134 (2d Cir.1997);
 
 Freeman v. Complex Computing Co.,
 
 119 F.3d 1044, 1052 (2d Cir.1997);
 
 Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,
 
 933 F.2d 131, 138 (2d Cir.1991);
 
 Gartner v. Snyder,
 
 607 F.2d 582, 586 (2d Cir.1979);
 
 United Orient Bank v. Green,
 
 215 B.R. 916, 925 (S.D.N.Y.1997),
 
 aff'd, 172
 
 F.3d 38 (2d Cir.1999).
 

 [64]
 

 . Am. Cpt. ¶¶ 23-24.
 

 [65]
 

 .
 
 Id.
 

 [66]
 

 .
 
 Id.
 

 [67]
 

 .
 
 Id.
 
 ¶ 95.
 

 [68]
 

 .
 
 Id.
 
 ¶ 96.
 

 [69]
 

 .
 
 Id.
 

 [70]
 

 .
 
 Id.
 

 [71]
 

 . Id. ¶ 31.
 

 [72]
 

 .
 
 Id.
 
 ¶ 76.
 

 [73]
 

 . Id. ¶ 99.
 

 [74]
 

 .
 
 Id.
 
 ¶ 86.
 

 [75]
 

 .
 
 Id.
 
 ¶ 87.
 

 The amended complaint alleges also a number of representations by MGRM to plaintiffs that MGAG and/or MG Corp. dominated MGRM with respect to the flexie contracts. It alleges that MGRM represented to plaintiffs that the contracts were “completely backed up’’ by MGAG, that MGAG and MG Corp. would “support and guarantee” MGRM’s performance, and that the MG Group constituted "one firm.”
 
 Id.
 
 H1128, 30, 64. Furthermore, the contracts, which are incorporated by reference into the amended complaint,
 
 sue supra
 
 note 19, list MG Corp. as the party to which all “financial notices” under the contract should be sent and note at the bottom of the first page that MGRM is a “member of the Metallgesellschaft Group.” Contract at 1, 7.
 

 [76]
 

 . MG Group Mem. at 23-29.
 

 [77]
 

 . Cancellation and Release Agreement 11112, 5 (Taylor Aff. Exs. 2-5) (emphasis added).
 

 [78]
 

 . PI. Mem. in Opp. to MG Group at 20-22.
 

 [79]
 

 . MGRM letter to Coale, Feb. 9, 1996 (Coale Dec. Ex. A); MGRM letter to Ports, Jan. 29, 1996 (Ports Dec. Ex. A).
 

 [80]
 

 .
 
 See Cahill v. Regan,
 
 5 N.Y.2d 292, 299, 184 N.Y.S.2d 348, 354, 157 N.E.2d 505 (1959);
 
 Lucio v. Curran,
 
 2 N.Y.2d 157, 157 N.Y.S.2d 948, 139 N.E.2d 133 (1956),
 
 Mangini v. McClurg,
 
 24 N.Y.2d 556, 562-64, 301 N.Y.S.2d 508, 512-14, 249 N.E.2d 386 (1969).
 
 See also Arias v. Mutual Cent. Alarm Serv. Inc.,
 
 182 F.R.D. 407 (1998),
 
 aff'd,
 
 202 F.3d 553 (2d Cir.2000);
 
 Simon v. Simon,
 
 274 A.D. 447, 448, 84 N.Y.S.2d 307, 309 (1st Dept. 1948).
 

 [81]
 

 . PL Mem. in Opp. to MG Group at 25-30.
 

 [82]
 

 . Pl. Mem. in Opp. to MG Group at 29-30; Merritt Dec. of May 24, 1999 (Bernstein Aff. at Ex. 10); Higginson Dec. óf May 24, 1999 (Bernstein Aff. Ex. 11); Cowden Dec. of May 24, 1999 (Bernstein Aff. Ex. 12).
 

 [83]
 

 . The flexies provided that "[n]o amendment or waiver of any provision ... or any departure by either party therefrom, shall be effective unless the same is in writing and signed by the party to be charged with such amendment, waiver or consent.” Contract ¶ 19(f).
 

 [84]
 

 . PL Mem. in Opp. to MG Group at 26-27; Merritt Dec. of Aug. 1, 1995 (Bernstein Aff. Ex. 7); Higginson Dec. of Aug. 14, 1995 (Bernstein Aff. Ex. 8); Cowden Dec. of Aug. 2, 1995 (Bernstein Aff. Ex. 9).
 

 [85]
 

 . The MG Group contends that, as the flexies do not expressly prohibit oral rescission, but merely amendment, waiver or departure by any party, the prior agreements attested to in the declarations are valid to rescind the contracts. MG Group Mem. at 9 n.ll. This is unconvincing. Recission necessarily is included in amendment, waiver or departure. Therefore, the flexies prohibit not only modification, but also rescission.
 

 [86]
 

 . Am. Cpt. ¶ 29.
 

 [87]
 

 .
 
 Id.
 

 [88]
 

 .
 
 Id.
 
 ¶¶ 78, 95.
 

 [89]
 

 .
 
 Id.
 

 [90]
 

 .
 
 Id.
 
 ¶ 96.
 

 [91]
 

 .
 
 Id.
 

 [92]
 

 .
 
 Id.
 
 ¶ 95.
 

 [93]
 

 .
 
 Id.
 
 ¶¶ 65, 75.
 

 [94]
 

 .
 
 Id.
 
 ¶ 67.
 

 [95]
 

 .
 
 Id.
 

 [96]
 

 .
 
 Id.
 
 ¶ 68.
 

 [97]
 

 .
 
 Id.
 
 ¶¶ 68-69, 73.
 

 [98]
 

 .
 
 Id.
 
 ¶ 76.
 

 [99]
 

 .
 
 Id.
 
 ¶ 85.
 

 [100]
 

 .
 
 See
 
 Melvin L. Cantor, John J. Kerr, Jr., and Thomas C. Rice,
 
 Lender Liability Theories, in
 
 Lender Liability Litigation: Recent Developments, at 74 (PLI Commercial Law and Practice Course Handbook Series No. 434, 1987).
 

 [101]
 

 .
 
 See
 
 Helen Davis Chaitman, The Law Of Lender Liability ¶¶ 5.02-5.09, 5-3-5-67 (1990).
 

 [102]
 

 . DB Mem. at 16-17; DB Repl. Mem. at 9-10.
 

 [103]
 

 . See
 
 ICD Holdings S.A. v. Frankel,
 
 976 F.Supp. 234, 243-44 (S.D.N.Y.1997).
 
 See also Apfel v. Prudential-Bache Securities Inc.,
 
 183 A.D.2d 439, 583 N.Y.S.2d 386 (1st Dept. 1992).
 

 [104]
 

 . Pl. Mem. in Opp. to DB at 23-24.
 

 [105]
 

 . N.Y. CPLR § 214(4).
 
 See also Rosemeier v. Schenker Int’l,
 
 895 F.Supp. 65, 66 (S.D.N.Y.1995).
 

 [106]
 

 . A cause of action for tortious interference with contract accrues at the time the injury is sustained, rather than the date of defendant’s alleged wrongful conduct or the date of breach.
 
 See Rosemeier,
 
 895 F.Supp. at 66;
 
 Kronos, Inc.
 
 v.
 
 AVX Corp.,
 
 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289 (1993). In the amended complaint, plaintiffs request damages plus interest from the date of the alleged breach. Am. Cpt. II 113. This can be interpreted only as an allegation that plaintiffs sustained injury as of the date of the breach, which occurred on July 27, 1995 at the latest. In consequence, the three year statue of limitations began running on that date. In any case, plaintiffs have not contended that the cause of action accrued later than July 1995.
 

 [107]
 

 . Pl. Mem. in Opp. to DB at 9-12.
 

 [108]
 

 .
 
 See Johnson v. Nyack Hospital,
 
 86 F.3d 8, 11 (2d Cir.1996);
 
 Long v. Frank, 22
 
 F.3d 54, 58 (2d Cir.1994), ce
 
 rt. denied,
 
 513
 
 U.S.
 
 1128, 115 S.Ct. 938, 130 L.Ed.2d 88.3 (1995);
 
 Dillman v. Combustion Engineering, Inc.,
 
 784 F.2d 57, 60 (2d Cir.1986).
 

 [109]
 

 .
 
 Simcuski v. Saeli,
 
 44 N.Y.2d 442, 448-49, 406 N.Y.S.2d 259, 262, 377 N.K.2d 713 (1978).
 
 See also Whitney Holdings, Ltd. v. Givotovsky,
 
 988 F.Supp. 732, 746 (S.D.N.Y. 1997).
 

 [110]
 

 .
 
 See Whitney Holdings,
 
 988 F.Supp. at 746. An exception to this rule exists where defendant stood in a fiduciary relationship to plaintiff that, obligated defendant to inform plaintiff of certain facts.
 
 Id.
 
 This exception clearly does not apply in this case.
 

 [111]
 

 .
 
 Id.
 
 at 747.
 

 [112]
 

 . Am. Cpt. ¶ 106.