Lennox LEWIS, et al., Plaintiffs,

v.

DON KING PRODUCTIONS, INC., et ano., Defendants.

No. 00 CIV. 0889 LAK.

United States District Court, S.D. New York.

April 12, 2000.

See also 2000 WL 288262.

Scott N. Gelfand, Fred M. Weiler, Meister, Seelig & Fein LLP, New York City, for Plaintiffs.

Peter Fleming, Jr., Michael C. Quinn, Curtis, Mallet–Prevost, Colt & Mosle LLP, New York City, for Defendant Don King Productions, Inc.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This case involves the question whether a renowned professional athlete is bound in his commercial dealings by the same standards of honesty and fairness aspired to by the rest of society.

Plaintiff Lennox Lewis obtained his opportunity to fight Evander Holyfield for the world heavyweight boxing title by agreeing with defendant Don King Productions, Inc. ("DKP") that, if Lewis defeated Holyfield, either (1) Lewis' next bout would be against the mandatory challenger or the leading available contender of the World Boxing Association ("WBA"), or (2) Lewis would vacate the WBA title. Lewis beat Holyfield and promptly signed next to fight Michael Grant, who is neither the WBA mandatory challenger nor its leading available contender. Lewis seeks a declaration that he was within his rights in doing so.[1] DKP counterclaims for specific performance of the contract and seeks damages against Lewis' promoters, Panix

---

1. Lewis initially sued also Henry Akinwande, the former World Boxing Organization ("WBO") heavyweight champion who, Lew- is alleged, was the WBA's leading available contender. Cpt. ¶ 45.

of the U.S.A., Inc. ("Panix") and New Jersey Sports Productions, Inc. d/b/a Main Events ("Main Events"), for inducing Lewis' alleged breach.

This opinion contains the Court's findings of fact and conclusions of law following a bench trial. The evidence overwhelmingly shows that Lewis' attempt to hold onto the WBA title *and* to fight Grant is in flat disregard of the agreement he signed. The arguments and justifications put forward by his promoters for this behavior—Lewis himself did not appear in Court to defend himself—are pretextual. Indeed, there is every reason to believe that Lewis' promoters never intended that Lewis would comply with the contract they and Lewis signed and were scheming to avoid that obligation at the moment they signed the agreement. While this Court applies the law of New York in deciding this case, it has little doubt that the Marquis of Queensbury would have reached the same result.

In short, Lewis has every right to fight Grant. But if he does so, he must surrender the WBA title as he agreed to do in order to get his shot at the crown.

### I

The world of professional boxing is governed in significant degree by three non-governmental organizations—the WBA, the International Boxing Federation ("IBF"), and the World Boxing Council ("WBC").[2] These three entities create weight classifications for professional fighters, name champions, rank challengers, and establish rules that require champions to defend their titles and afford opportunities to leading challengers to fight for their respective titles.[3]

Sometimes the three organizations' titles for a given weight classification, *e.g.*, heavyweight, are united in a single individual. At other times, the titles are fragmented, with different individuals holding the championships of different rating organizations. This lawsuit has its origins in such a fragmentation of the heavyweight titles of the rating organizations.

### The Genesis of the Problem

In late 1997, Evander Holyfield held the WBA and IBF world heavyweight championships.[4] Plaintiff Lennox Lewis was the WBC champion. And there was a dispute in the WBA as to whether Orlin Norris was entitled to fight one of the WBA's top-ranked boxers and subsequently, if victorious, to fight Holyfield for the WBA title.[5] The dispute led to litigation in the United States District Court for the Eastern District of Pennsylvania that culminated in November 1997 in a settlement that provided in substance that Norris would fight Akinwande on or before December 21, 1997, and that, if Norris won, he would have the right to fight Holyfield for the WBA title by June 28, 1998 or, if Holyfield retired or forfeited the title, the WBA's leading available contender.[6]

Akinwande promptly defeated Norris, thereby becoming the leading available contender for the WBA heavyweight championship, and signed to fight Holyfield for the WBA and IBF titles in June 1998.[7] At the last minute, however, Akinwande tested positive for hepatitis B, so the fight was canceled.[8] Holyfield then fought and defeated Vaughn Bean in September 1998, thereby retaining his IBF title.[9] At about the same time, Lewis defeated Zeljo Mavrovic and retained his WBC heavyweight title.[10]

**2.** PX 201 (English) ¶ 6; PX 205 (Maloney) ¶ 4; DX III (King) ¶ 5.

**3.** PX 201 ¶ 6; PX 206 (Chwasky) ¶ 7.

**4.** PX 64 (King Aff., Feb. 7, 2000) ¶ 6.

**5.** PX 201 ¶ 35–36.

**6.** PX 21 (*Norris v. World Boxing Assoc.,* 97 Civ. 2498 (Amended Order, Nov. 12, 1997) (NLS)).

**7.** PX 64 ¶¶ 7–8.

**8.** *Id.* ¶ 9; DX AAA (Wirt) ¶ 12.

**9.** PX 64 ¶ 11.

**10.** *Id.*

*The Unification Bout—Holyfield–Lewis I*

Although the Akinwande–Holyfield fight was canceled in consequence of Akinwande's illness, Akinwande was expected to recover and to fight again. He remained the WBA leading available contender and, under WBA rules, was entitled to demand that Holyfield defend his title against him. Nevertheless, the fragmentation of the heavyweight championships between Holyfield and Lewis made a fight between the two—a so-called unification bout, the winner of which would hold all three heavyweight titles and be the undisputed heavyweight champion of the world—extremely attractive.[11] In consequence, negotiations for a Holyfield–Lewis title fight were undertaken.[12] These negotiations culminated in an agreement among Panix and Main Events, Lewis' principal promoters, and DKP, which would promote the bout,[13] and in agreements between the each of the three rating organizations and each of Lewis and Holyfield.[14]

The Panix–DKP agreement provided in substance for the holding of a unification bout between Lewis and Holyfield, but it dealt also with the fact that Akinwande was giving up his right to fight Holyfield for the WBA title prior to Lewis' doing so.[15] Paragraph 10 obliged Lewis, if he defeated Holyfield and thus became the WBA champion, either (1) next to fight Akinwande (or the WBA's leading available contender if Akinwande lost that status) or (2) vacate the WBA title.[16] Moreover, as DKP promoted Akinwande (as well as other ranked heavyweights), it agreed that DKP would have the certain

rights to promote such a title defense title by Lewis.[17]

The agreements reached between the rating organizations, Holyfield and Lewis all addressed the need for the organizations to sanction the unification bout and their interests in assuring that the winner of that bout either would defend his title against the WBA's leader available contender, be he Akinwande or someone else, or vacate the title.[18] Each of the two fighters promised that he would do so and otherwise abide by the WBA's rules and regulations.[19]

The Lewis–Holyfield fight took place on March 13, 1999 at Madison Square Garden.[20] (This fight often is referred to below as Lewis–Holyfield I.) In a highly controversial decision, the judges ruled that the bout was a draw, a decision that left the titles fragmented and created pressure for another unification bout.[21] Indeed, the three rating organizations directed a Lewis–Holyfield rematch within six months and extended the time within which their respective champions were obliged to fight their respective leading challengers to accommodate the bout.[22]

*The Contract at Issue*

Negotiations among Panix, Main Events and DKP for the rematch began in earnest on August 24, 1999 when DKP's assistant general counsel, John Wirt, faxed a proposed amendment to the contract for Lewis–Holyfield I to the Lewis side, namely Panos Eliades, the principal of Panix.[23] The proposal did not suggest any change to paragraph 10(a) of the original contract,

---

11. *Id.* ¶ 12; PX 201 ¶ 30; PX 205 ¶ 9; PX 206 ¶ 11.

12. PX 64 ¶ 12; DX III ¶ 14.

13. PX 64 ¶ 14; PX 3 (Contract for Lewis–Holyfield I Bout, Nov. 10, 1998).

14. PX 4 (Letter from Lewis to WBA, WBC and IBF, Nov. 30, 1998); DX B; DX AAA ¶ 14; DX DDD (Lewis Dep.) at 25–27, 31–32.

15. PX 3.

16. *Id.*

17. *Id.*

18. PX 4; DX B.

19. *Id.*

20. PX 64 ¶ 17.

21. *Id.* ¶ 18; PX 206 ¶ 19; DX AAA ¶ 22.

22. PX 65 (IBF Letter to Holyfield and Lewis, Mar. 15, 1999).

23. PX 6 (Wirt Proposed Amendment, Aug. 24, 1999).

the provision that dealt with (a) Lewis' obligation, if he defeated Holyfield, either next to fight Akinwande or the WBA leading available contender or, alternatively, to vacate the WBA title as well as (b) DKP's right to promote Lewis in the future.[24]

By this time, the Lewis camp—Lewis, Panix and Main Events—had decided that it no longer was willing to give DKP promotional rights to any future bouts involving Lewis. In consequence, Patrick English, an attorney for Main Events, and Milton Chwasky, Panix's U.S. attorney, promptly responded that the Lewis group was prepared to enter into an entirely new contract for the rematch, but that it would not amend the original contract.[25] Their expressed object in taking that position was to make clear that DKP would have no future promotional rights with respect to Lewis.[26]

DKP acquiesced in the proposition that the parties enter into an entirely new agreement. On the following day, therefore, Wirt faxed to English, Chwasky and Eliades a draft of a complete contract for the rematch,[27] thus setting off two days of intensive negotiations that focused in significant part on paragraph 10—the provision governing Lewis' obligation either to fight next Akinwande or the WBA leading available contender or to vacate the WBA title in the event he defeated Holyfield. The key participants in these events were Wirt and Charles Lomax for DKP, English for Main Events, and Chwasky for Panix, although Don King, the principal of DKP, and Eliades each played a brief role.[28]

Critical aspects of these discussions are subjects of sharply conflicting testimony. All of these individuals testified in person, and the Court took advantage of the opportunity to judge not only the logic of their accounts and the extent to which they were corroborated or not corroborated by other evidence, but also their demeanor. The following findings therefore reflect the Court's judgment as to the credibility of the witnesses—where the Court has made a finding contrary to the testimony of a particular witness, it reflects the Court's view that the witness did not testify accurately, whether advertently or inadvertently.[29]

The initial Wirt draft of the contract for the rematch acquiesced in the Lewis camp's desire that DKP surrender any future promotional rights to Lewis.[30] Paragraph 10 of the draft—which, despite the battle that raged for two days, ultimately proved to be the precise language contained in the final contract—provided as follows:

"The parties agree that DKP shall not have any future promotional rights to Lewis after the Rematch; provided, however, that if Lewis wins the Rematch, the parties understand and agree that Lewis' next bout after the Rematch shall be against the WBA's mandatory challenger or its leading available contender pursuant to the rules and regulations of the WBA; provided, further, however, that if Lewis chooses not to fight such WBA mandatory challenger or leading available contender, Lewis shall vacate the WBA title consistent with the rules and regulations of the WBA."[31]

This language troubled the Lewis negotiators. They knew that the WBA leading available contender at the time was Akinwande, and they did not consider him a desirable opponent for Lewis for a variety

24. *Id.*

25. PX 23 (English–Chwasky Letter to Wirt, Aug. 24, 1999).

26. *Id.*

27. PX 7 (DKP Draft Agreement, Aug. 25, 1999).

28. DX AAA, *passim;* DX BBB (Lomax), *passim;* DX III, *passim;* PX 201, *passim;* PX 203 (Eliades), *passim;* PX 206, *passim;* PX 64, *passim.*

29. In this connection, the Court finds that the testimony of Milton Chwasky on the critical disputed points was mendacious and entirely unreliable.

30. PX 7 ¶ 10.

31. *Id.*

of reasons.[32] Although English[33] and Chwasky[34] contended otherwise at trial, the Court finds that they did not want Lewis, if he beat Holyfield, next to fight Akinwande. Moreover, even prior to the start of these negotiations, the Lewis camp had been told by Home Box Office ("HBO"), an important source of revenues for the broadcast of professional boxing, that a fight between Lewis and Michael Grant—both of whom had existing contractual relationships with HBO[35]—would be very attractive if Lewis defeated Holyfield.[36] Grant, however, was not the WBA leading available contender[37] and was not likely to be in the then foreseeable future. So the Lewis negotiators were determined to avoid, if at all possible, signing a contract that would lock Lewis into either fighting the WBA leading available contender or vacating the title if he beat Holyfield. Rather, they hoped to make a deal that would leave Lewis free to fight Grant next.

The initial means by which they sought this end was a markup of the DKP draft reflecting the comments of Eliades, Chwasky and English which English sent to Wirt at 5:35 p.m. on August 26, 1999.[38] Their proposed paragraph 10 was as follows, with the deletions from Wirt's prior draft enclosed in brackets and the additions presented in italics:

> "The parties agree that DKP shall not have any future promotional rights to Lewis after the Rematch; provided, however, that if Lewis wins the Rematch, the parties understand and agree ·that Lewis' next bout after the Rematch shall be against the WBA's mandatory challenger or its leading available con-

tender pursuant to the rules and regulations of the WBA; provided, further, however, that *if Lewis chooses not to fight* such WBA mandatory challenger or leading available contender, Lewis shall vacate the WBA title *or otherwise comply* [consistent] with the rules and regulations of the WBA." [39]

As English admitted at trial, the purpose of this linguistic change was "to maximize [Lewis'] flexibility." [40] More precisely, the object was to transform Wirt's proposal—which Eliades, Chwasky and English understood to mean that Lewis, if he won the rematch, would have either to fight the WBA leading available contender next or to vacate the title—into a clause that would permit Lewis to refuse to fight the WBA leading available contender and to retain the title, as long as he could do so without violating the WBA rules.[41] While that would have required a special dispensation from the WBA, the Lewis group was hopeful that such an exception· could be obtained.

The DKP attorneys were unwilling to agree to Lewis' proposal. ˙ Indeed, they evidently became concerned that their own language—"vacate the WBA title consistent with the rules and regulations of the WBA"—might leave Lewis too much room to try to wiggle out of either defending the title against the leading available contender or ˙vacating it.[42] So they prepared a new draft, paragraph 10 of which simply terminated with the words "vacate the title," thus eliminating any reference to doing so "consistent with" or "otherwise comply[ing] with" the WBA rules, and faxed it to English, Chwasky and Eliades at 8:37 p.m. on August 26, 1999.[43]

---

32. PX 203 ¶ 21; PX 206 ¶ 34.

33. Tr. (English) at 94–95.

34. Tr. (Chwasky) at 238.

35. Tr. (Chwasky) at 232; DX DDD at 48–49.

36. *Id.*

37. PX 98 (WBA November 1999 and December 1999 Ratings).

38. PX 8 (Lewis Team Draft Agreement, Aug. 26, 1999).

39. *Id.* ¶ 10.

40. PX 201 ¶ 79; Tr. (English) at 65.

41. Tr. (English) at 65–66.

42. *See* DX AAA ¶ 36.

43. PX 9 (DKP Draft Agreement, Aug. 26, 1999).

Later that evening, Wirt and English spoke by telephone.[44] Wirt insisted adamantly on behalf of DKP that Lewis, if he defeated Holyfield, either would have to vacate the title or defend it against the leading available challenger.[45] He accused English of trying to redraft paragraph 10 to give Lewis an "out" from this obligation.[46]

By the next morning, the Lewis side had prepared another draft which it faxed to Wirt and Lomax.[47] The new draft reverted to the original Lewis proposal with respect to paragraph 10—"vacate the WBA title or otherwise comply with" the WBA rules.[48] This provoked a letter from Don King to Panos Eliades, faxed shortly after noon on August 27, with which he enclosed a list of open issues and stated his position on each.[49] With respect to paragraph 10, he wrote:

> "If Lewis wins, and decides not to fight the WBA contender, he must give up the [championship] belt. Your language would give him an out and that is completely unacceptable and a deal breaker. ¶ 10." [50]

The dispute simmered on through the afternoon of the 27th, with the DKP forces insisting on the unqualified "vacate the title" formulation and the Lewis camp demanding the addition of "or otherwise comply with" the WBA rules.[51] During the course of the day, however, Wirt and Lomax telephoned Eliades and conveyed DKP's position that English's insistence on the "other otherwise comply" language would kill the entire deal.[52] Eliades responded that English represented Main Events, but not Lewis or Panix, and that DKP did not have to make the change upon which English insisted, and suggested that DKP get in touch with Panix's lawyer, Chwasky, to finalize the contract.[53]

Lomax and Wirt then telephoned Chwasky.[54] English was on the line as well.[55] Lomax and Wirt advised Chwasky that Eliades had agreed that DKP did not have to make the change in paragraph 10 upon which English was insisting.[56] Chwasky then agreed with DKP's position that Lewis' obligation, if he beat Holyfield, unconditionally would be to fight the WBA leading available contender or vacate the WBA title.[57] He suggested that the parties go back to Wirt's initial draft of paragraph 10—"vacate the title consistent with" the WBA rules.[58] Lomax said he would be willing to do so, but only if it was understood and agreed that that language meant that Lewis' obligation to vacate the WBA title if he defeated Holyfield and declined to fight the leading available contender was unavoidable.[59] Chwasky agreed that the original Wirt formulation would have that meaning.[60] The contract was finished and executed with that language in para-

**44.** PX 201 ¶ 96; Tr. (English) at 71. English testified that Lomax and Chwasky may have been on the call as well. PX 201 ¶ 96.

**45.** Tr. (English) at 78.

**46.** PX 201, ¶ 96; Tr. (English) 70–71, 78.

**47.** DX DD (Lewis Team Draft Agreement, Aug. 27, 1999).

**48.** *Id.*

**49.** PX 12 (King Letter to Eliades, Aug. 27, 1999).

**50.** *Id.* at D000905 ¶ 5.

**51.** *See, e.g.,* PX 13 (English Letter to Lomax, Aug. 27, 1999); PX 11 (DKP Draft Agreement, Aug. 27, 1999); DX AAA ¶ 46; Tr. (English) 434.

**52.** DX AAA ¶ 43–44. Sherman Smith of DKP was on the line as well. DX CCC (Smith) ¶ 6.

**53.** DX AAA ¶¶ 44–45.

**54.** *Id.* ¶ 47.

**55.** PX 201 ¶ 98. Don King also may have been on the call. *Id.* Smith was on the line, DX CCC ¶ 8, but did not participate, PX 201 ¶ 98.

**56.** DX AAA ¶ 48.

**57.** *Id.* ¶ 48; PX 201 ¶ 99.

**58.** DX AAA ¶ 49; PX 206 ¶¶ 32–33.

**59.** DX AAA ¶ 49.

**60.** *Id.*

graph 10 on the evening of August 27, 1999.[61]

*Lewis–Holyfield II and its Sequelae*

The Lewis–Holyfield rematch ("Lewis–Holyfield II") took place on November 13, 1999.[62] Lewis defeated Holyfield and thus became the undisputed heavyweight champion, holding the WBA, IBF and WBC titles.[63] Under his agreement with DKP, he was obliged next to fight the WBA leading available contender or to vacate its title.[64] But Lewis and his promoters immediately began maneuvering to have Lewis fight Grant, who was not the leading available contender, next *and* to avoid surrendering the WBA title.

Discussions about a Grant fight moved forward immediately.[65] The same HBO executive again expressed interest to the Lewis group in a Lewis–Grant fight.[66] Lewis' people began discussions with Grant's almost immediately after Holyfield II.[67]

While arrangements with Grant were proceeding, efforts to circumvent the DKP agreement moved into high gear. In late November, Frank Maloney, Lewis' trainer, attended the WBA convention and complained to Gilberto Mendoza, Sr., the WBA president, Gilberto Mendoza, Jr., the WBA director, and Jimmy Binns, the WBA's attorney, that Akinwande was not legitimately the leading available contender,[68] a move designed to create controversy and, hopefully, uncertainty as to the identity of the WBA leading available contender. In December, the Lewis group asked the District Court in Philadephia to make clear that its 1997 order did not require the WBA to rank Akinwande as its leading available contender.[69] And at about the same time, the Lewis team made what it entitled "A Modest Proposal" to all three rating organizations—that they sanction a "box off" among title contenders to decide upon a single leading available contender.[70]

The title of the Lewis proposal of course is identical to that of Jonathan Swift's classic satirical essay,[71] wherein he proposed dealing with the large numbers of impoverished children in Ireland by eating them. And the identity of title is fitting, for Lewis had no more interest in a box off for its own sake than Swift had in eating Irish children. The Lewis camp's real object was delay. Had the proposal been accepted, the Lewis–Grant fight would have been history before the box off determined the identity of a single challenger, and Lewis would have used the prospect of the box off to argue that there was no WBA leading available contender to fight before Lewis fought Grant. This in turn would have set up an argument that Lewis would not be obliged to vacate the WBA title in order to fight Grant, as there would have been no leading available contender. But the WBA did not immediately respond.[72]

In early January, Lewis reached agreement to fight Grant on April 29, 2000[73] and promptly announced the planned bout to the press.[74] In late January, Lewis, Main Events and Panix commenced this action, principally for a declaration that the agreement with DKP did not require Lewis next to fight Akinwande and that paragraph 10 in any case was not enforceable.[75] And on February 2, the WBA ap-

---

61. DX EE, PX 15.

62. PX 201 ¶ 5; PX 205 ¶ 17.

63. PX 201 ¶ 5; DX AAA ¶ 53.

64. DX EE ¶ 10.

65. Tr. (English) at 99.

66. Tr. (Chwasky) at 231–32.

67. Tr. (English) at 99.

68. PX 201 ¶ 118; PX 205 ¶¶ 18–19.

69. PX 201 ¶ 131.

70. PX 38 ("Modest Proposal" from Lewis to WBA, WBC and IBF, Dec. 6, 1999).

71. JONATHAN SWIFT, A MODEST PROPOSAL (1729).

72. PX 205 ¶ 22; PX 206 ¶ 48.

73. PX 201 ¶¶ 140, 161; Tr. (Chwasky) at 233.

74. PX 64 ¶ 23.

75. Complaint, filed Jan. 20, 1999, docket entry 1.

parently rebuffed Lewis' "Modest Proposal." It wrote that Akinwande was its ·leading available contender, pointed out that WBA rules required a champion to defend his title against the leading available contender within twelve months,[76] and concluded with a handwritten note stating that Lewis "must comply with [his] engagements. The WBA will act consequently." [77]

During the ensuing two weeks, the District Court in Philadelphia made clear that the WBA was not required to continue Akinwande as its leading available contender,[78] and the Lewis forces persisted in their efforts to muddy the waters by attacking Akinwande's WBA rating.[79] These efforts bore some fruit in the latter part of February, when the WBA issued its ratings for January, which ranked John Ruiz, who already was under contract to fight Evander Holyfield in June 2000,[80] as the leading contender.[81]

On February 15, 2000, Lewis' advisers finally decided to do something about Lewis' obligation under the WBA rules to fight its leading available contender and requested that the WBA grant a special exception to permit him first to fight Grant.[82] The delay in seeking WBA approval until after the Grant fight was committed and publicly announced, the Court finds, was an effort to present the WBA with a *fait accompli* and thus to enhance the chances of obtaining the special exception. In any case, the WBA held a hearing on that subject on March 6, 2000.[83] On March 18, 2000, it granted the special exception conditional upon both Lewis and Grant agreeing, on or before April 1, 2000, that the winner would defend the WBA title against the leading available contender within 180 days of the Lewis–Grant fight.[84]

So matters stood as this case went to trial on March 21, 2000: Lewis was scheduled to fight Grant on April 29, 2000 and refused to surrender the WBA title notwithstanding that Grant was not the WBA leading available contender and his agreement with DKP.

## II

The complaint asserts four claims for relief. Each is without merit.

*Declaratory Judgment as to Akinwande*

The first claim is best understood in light of the fact that Henry Akinwande was the WBA's top ranked, and therefore leading available, contender at the time this lawsuit began. At that point, it was Akinwande whom Lewis would have been obliged to fight in order to avoid vacating the WBA title. Accordingly, this claim seeks a declaration that Lewis is not obliged next to fight Akinwande or vacate his title.[85] Since the commencement of the action, however, the WBA has issued new ratings. Akinwande now is ranked fifth,[86] and neither side contends that he is the leading available contender. In consequence, the dispute in respect of which the first claim for relief sought a declaratory

---

**76.** A subsequent letter from Cordova clarified that this statement was an error and that Lewis was required to defend his title against the leading available contender within 180 days of the Lewis–Holyfield II bout. PX 79 (Cordova Letter to English, Feb. 23, 2000).

**77.** PX 17 (Cordova Letter to Lewis, undated, faxed Feb. 2, 2000).

**78.** PX 92 (*Norris v. World Boxing Assoc.*, 97 Civ. 2498 (NLS), hearing transcript, Feb. 7, 2000) at 25–26.

**79.** PX 18 (English Letter to Cordova, Feb. 13, 2000), PX 22.

**80.** PX 48 (Holyfield–Ruiz Agreement, Jan. 5, 2000).

**81.** PX 25 (WBA Jan. 2000 Ratings).

**82.** PX 22 (Maloney Letter to Mendoza, Feb. 15, 2000).

**83.** PX 102 (Transcript of WBA Hearing, Mar. 6, 2000).

**84.** PX 101 (Cordova Letter to Maloney, Mar. 18, 2000).

**85.** Cpt. ¶ 65.

**86.** PX 25.

judgment has been mooted by subsequent events. There no longer is any justiciable controversy.[87] Accordingly, the first claim must be dismissed.[88]

*Fraudulent Inducement*

 The second claim seeks to void paragraph 10 of the Lewis–Holyfield II contract on the ground that DKP induced plaintiffs to enter into it by fraudulently misleading them to believe that Akinwande was healthy and able to fight.[89] This assertion was frivolous in its inception.

 In order to avoid a contract on the ground of fraud, the plaintiff ordinarily must establish that the defendant made a false statement as to a material fact upon which the plaintiff reasonably relied in entering into the agreement.[90] And it is perfectly plain that plaintiffs here have not proved each of the essential elements of their claim.

Among the facts that emerge most clearly from this record is the proposition that plaintiffs did not want Lewis to fight Akinwande in any reasonably foreseeable circumstances.[91] They thought that Akinwande had not performed adequately as a fighter, that he had not fought worthy opponents in recent years, that he had fought Lewis previously and performed badly, and that he was not ranked among the top five contenders by either the IBF or the WBC.[92] Plaintiffs' claim of deception, however, is that DKP made it appear more likely that Lewis would have to fight Akinwande if he defeated Holyfield than really was the case, as Akinwande's health allegedly was poorer than plaintiffs claim to have believed.[93] Even assuming all that to be so, plaintiffs could not prevail on this claim. The more likely that Akinwande actually could fight if Lewis beat Holyfield, the less attractive the contract to plaintiffs. *Per contra,* the less likely that Akinwande could fight, the more attractive the contract. In consequence, the Court finds that the facts allegedly concealed—that Akinwande was ill and unlikely to be able to fight Lewis if he beat Holyfield—were neither material to the plaintiffs nor relied upon by them in entering into the agreement.[94] Moreover, the agreement contemplated the possibility that the leading contender would be unable or unavailable to fight Lewis and provided a mechanism for dealing with that eventuality—Lewis' obligation is to fight the leading available contender, whoever that may be, not to fight Akinwande. Accordingly, the second claim for relief must be dismissed.

87. See, e.g., Arizonans for Official English v. Arizona, 520 U.S. 43, 45, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); Shaffer v. Howard, 249 U.S. 200, 201, 39 S.Ct. 255, 63 L.Ed. 559 (1919).

88. It might be noted that plaintiffs sought and obtained leave to file an amended complaint in light of post-filing developments but never did so. Lewis v. Don King Productions, 00 Civ. 0889(LAK) (Order, Feb. 25, 2000).

89. Cpt. ¶ 79.

90. See Frankel v. ICD Holdings S.A., 930 F.Supp. 54, 65 (S.D.N.Y.1996); 12 SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 1487, at 324 (3d ed.1970).
Scienter is not an element where the relief sought is an equitable decree setting aside an agreement. See, e.g., Taylor v. Burr Printing Co., 26 F.2d 331, 333 (2d Cir.), cert. denied, 278 U.S. 641, 49 S.Ct. 36, 73 L.Ed. 556 (1928); In re American Knit Goods Mfg. Co., 173 F. 480, 482 (2d Cir. 1909); 12 WILLISTON § 1500, at 400–01.

91. PX 203 ¶ 21; PX 206 ¶ 34.

92. Id.

93. Pl. Pre–Trial Mem. at 29; PX 201 ¶¶ 102–12; PX 203 ¶¶ 22–23; PX 206 ¶¶ 35–39.

94. See Tr. (English) at 138–39 (acknowledging that Lewis did not want to fight Akinwande in the first place). Chwasky testified that "Akinwande's health was material to the mandatory rematch agreement, and Lewis, Main Events, and Panix would never have entered into the rematch agreement with DKP containing Paragraph 10 had they known the truth about Akinwande's active Hepatitis." PX 206 ¶ 40. Eliades testified to the same effect. PX 203 ¶ 24. However, in light of powerful evidence to the contrary, the Court finds this testimony impossible to credit.

## Breach of Contract

■ The third claim for relief is a reprise of the second. Plaintiffs claim that DKP breached the implied covenant of good faith and fair dealing in the Lewis–Holyfield II contract by failing to disclose to them, following its execution, what it knew of Akinwande's physical condition.[95]

There is considerable doubt as to whether DKP knew anything significant regarding Akinwande's physical condition during the relevant time period that was not a matter of public knowledge[96] and as to whether, if it did, it had any obligation to disclose that knowledge to plaintiffs. But there is no need to deal with those matters, as Lewis' duty to perform pursuant to paragraph 10 would not be excused even if DKP committed such a breach.

Every breach of contract that results in injury gives rise to a claim for damages.[97] But not every breach discharges the duty of the non-breaching party to perform.[98] Rather, a breach that goes to the heart of the contract gives the non-breaching party the right to terminate the contract or, alternatively, to continue with the contract and seek damages for the breach.[99]

Any breach by DKP through failure to inform plaintiffs of Akinwande's physical condition most assuredly did not go to the heart of the contract. Lewis' obligation is to fight whoever is the WBA's leading available contender, not necessarily Akinwande.[100] Indeed, it was the possibility that Akinwande would be too ill to fight that resulted in the change of the relevant provision between the Lewis–Holyfield I and Lewis–Holyfield II contracts; the former required Lewis, if he beat Holyfield, to fight Akinwande or the WBA's leading available contender while the latter simply referred to the leading available contender without naming Akinwande.[101] In consequence, the third claim for relief is without merit.

## Breach of Contract—BSkyB

■ The fourth claim seeks damages for breach of paragraph 4 of the contract, in which DKP agreed to cause British Sky Broadcasting ("BSkyB"), the British broadcaster of the Lewis–Holyfield rematch, to pay a specified percentage of the revenues from the rematch broadcast directly to Panix/Main Events at the same time that payment is made to DKP, the event's promoter.[102] DKP agreed to remain liable for any amount unpaid.[103] At the time of trial, Panix/Main Events had not received payment under this provision.[104]

On February 2, 2000, BSkyB's general counsel, Jonathan Sykes, sent a letter to Eliades confirming that BSkyB was in the process of calculating revenue figures from the broadcast and had not yet paid DKP.[105]

95. Cpt. ¶ 83.

96. *See* DX FFF (Zakko Dep.) *passim;* DX GGG (Posternack Dep.) *passim;* DX III ¶ 29.

97. *See, e.g., Cary Oil, Co. v. MG Refining and Marketing, Inc.,* 90 F.Supp.2d 401, 408 (S.D.N.Y.2000).

98. *See id.* at 408–09.

99. *Id.*

100. DX EEE ¶ 10.

101. One might imagine circumstances in which a failure to disclose publicly unavailable facts regarding Akinwande's health, assuming DKP was obliged to make such disclosure, would have injured Lewis and given rise to a claim for damages. Lewis, for example, might have spent time negotiating for a bout with Akinwande and sacrificed an opportunity to fight the next ranked contender by doing so, only to find out that DKP had known all along that Akinwande would be unable to fight and thus lost both bouts. In such circumstances, he might well have had a substantial damage claim. But this is purely a theoretical possibility, advanced only for illustrative purposes. Plaintiffs neither claim injury caused by the alleged nondisclosure nor sought or proved damages.

102. Cpt. ¶¶ 92–94; PX 15 ¶ 4(c).

103. DX EE ¶ 4(c).

104. PX 206 ¶ 46.

105. DX CC (Skyes Letter to Eliades, Feb. 2, 2000).

At trial, Lomax testified that BSkyB was still conducting an audit to determine the amount due.[106] As DKP's obligation under paragraph 4 becomes due only at the time that BSkyB remits payment to DKP,[107] and as no such payment apparently has yet been made, Panix/Main Event's claim under this provision is not yet ripe for adjudication.[108] Indeed, after an audit, BSkyB well may determine that there is no upside payment to be made, in which case DKP will not be obliged under paragraph 4 to cause BSkyB to make any payment to plaintiffs. In consequence, plaintiffs' fourth claim for relief is dismissed for lack of any existing case or controversy.

### III

The central issue in the case is raised by DKP's counterclaim—whether the contract obliges Lewis to fight the WBA's leading available contender before he fights anyone else or, alternatively, to vacate the WBA title. Lewis advances a plethora of arguments as to why it does not do so.

*Enforceability of Paragraph 10*

In addition to contending that paragraph 10 is unenforceable because it was induced by fraud, the argument rejected above, Lewis contends that it is unenforceable because it violates WBA Rule 7.1 and was not supported by consideration.[109] These contentions are of no avail.

*Rule 7.1*

WBA Rule 7.1 provides in relevant part that:

"Any clause included in Agreements for World Championship Fights containing provisions that guarantee or otherwise insure or promise a World Championship rematch to any of the contenders shall be void. The purpose of this Rule consists of strictly limiting the legal affects [*sic*] of each agreement to the single match for which it was principally issued. Nor shall this agreement ... contain any clause by which the services of either or both contenders would be guaranteed or otherwise insured in favor of any promoter, promotional group or collective company for any future fight or fights after the conclusion of the match, which is mainly stipulated in the agreement." [110]

There are substantial questions as to whether WBA rules, which are not statutes and lack the force of law, could void private contracts that contravene their terms.[111] But there is no need to decide those issues, as the term of the contract that DKP relies upon here does not violate Rule 7.1. Paragraph 10, contrary to Lewis' contention,[112] does not guarantee Lewis' services to DKP as a promoter for any future fight. Indeed, Lewis' contention is pure sophistry. Although paragraph 10 as it appeared in the Lewis–Holyfield I contract was changed in the Lewis–Holyfield II agreement for the precise purpose of eliminating any future DKP promotional rights in Lewis, Lewis seizes on DKP's contention that "the deal" for Lewis–Holyfield II was the same as for the first fight—patently a reference to the agreement that Lewis, if he defeated Holyfield, either would fight his next bout against the WBA leading available contender or surrender the WBA title—and seeks to generalize that limited contention to a description of the entire contract.

---

106. Tr. (Lomax) at 334, 338.

107. DX EE ¶ 14(c).

108. *See Pasqualini v. Sheet Metal Workers' National Pension Fund,* 54 F.Supp.2d 357, 364 (S.D.N.Y.1999).

109. Pl. Pre–Trial Mem. at 26–28.

110. PX 70 (WBA Rules and Regulation), Rule 7.1, at D 001531–32.

111. Tr. at 19–21.
 Nowhere does the contract condition its enforceability on the compliance of its terms with the WBA rules, although it does so with respect to conflicts between its terms and the laws, rules or regulations of "any governmental authority." PX 15 ¶ 21.

112. Pl. Pre–Trial Mem. at 25.

*Consideration*

Lewis concedes that there was adequate consideration for the Lewis–Holyfield I contract in that Akinwande had to step aside in order to permit Lewis to fight Holyfield.[113] But there was no such need when the Lewis–Holyfield II contract was agreed, he contends, because the three rating organizations had mandated a Lewis–Holyfield rematch and thereby eliminated any need for Akinwande to step aside for the second fight.[114] He therefore argues that there was no consideration for paragraph 10.[115] But this argument too is entirely frivolous.

■ As Lewis correctly points out, "consideration can be either benefit to the promisor or detriment to the promisee."[116] But in determining whether there is consideration, one must look at the entire agreement, not merely at a single paragraph.[117] And Lewis received any number of valuable promises by DKP in exchange for his accession to the Lewis–Holyfield II agreement including, among others, Holyfield's agreement to the fight, DKP's agreement to use its best efforts to maintain WBC, WBA and IBF sanction of the bout as a world heavyweight championship fight, the right to have Lewis' promoters attend all marketing meetings and have input into marketing decisions and, far from least, DKP's payment to Lewis' promoters of at least $15 million.[118] Lewis' promise next to fight the leading available contender or vacate the WBA title was part of what Lewis surrendered in exchange for these benefits. To suggest in these circumstances that Lewis received

no consideration for that promise is irresponsible.

*Alleged Non–Occurrence of Condition Precedent*

Lewis contends also that his obligation under paragraph 10 to fight the WBA mandatory bout or vacate the title has not arisen because of the non-occurrence of a condition precedent—namely, the WBA's failure to designate a mandatory challenger or leading available contender as required by its rules.[119] He argues that "leading available contender" is a term of art, referring not to the highest rated available boxer on WBA's published ratings list, but to the boxer officially designated as leading available contender by the WBA Championships Committee,[120] who may or may not be the highest rated available boxer on the list. No such official selection, Lewis contends, ever occurred.[121]

Lewis' argument is based on WBA Rule 9.1, which provides:

"The Leading Available Contender shall be selected by the World Championships Committee, according to the current list of the best rated boxers, published by the ratings committee. For the effect of this regulation, the current Ratings are those which correspond to the month during which the Champion is obliged to defend his title against the Leading Available Contender, or on any other date that the Championships Committee shall decide, with justified causes."[122]

And if one focused exclusively on the first clause of the opening sentence, there

---

113. *Id.* at 26.

114. *Id.* at 26–27.

115. *Id.*

116. *Id.* at 26 (citing *Banque Arabe et Internationale D'Investissement v. Bulk Oil (USA) Inc.*, 726 F.Supp. 1411, 1419 (S.D.N.Y. 1989)).

117. *See, e.g., Thomas Well Serv., Inc. v. Williams Natural Gas Co.*, 873 F.Supp. 474, 488 (D.Kan.1994) (contract as a whole must be supported by consideration; separate consideration for each paragraph unneces-

sary), *aff'd,* 64 F.3d 670 (10th Cir.1995); 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS ("FARNSWORTH") § 2.3, at 76 (2d ed.1998) (same consideration can support number of promises).

118. DX EE, *passim.*

119. Pl. Pre–Trial Mem. at 11–21; PX 201 ¶ 8.

120. PX 201 ¶ 10.

121. Pl. Pre–Trial Mem. at 11.

122. PX 70, Rule 9.1, at D 001534.

would appear to be a basis for Lewis' position. The problems with his argument, however, are manifold.

To begin with the rule's literal terms, they require the World Championships Committee to select the leading available contender "according to the current list of the best rated boxers . . . ." This may mean, as Lewis suggests, that the committee in selecting a leading available contender merely is obliged to consider the rating list in deciding which ranked fighter is the leading available contender. But it could mean also that the committee is obliged to designate as the leading available contender the available fighter ranked highest on the rating list, in which case the committee's role would be ministerial and the lack of a formal designation immaterial. Hence, the literal terms of the rule do not unambiguously support Lewis' argument. Indeed, the more likely reading is that the committee's role is not substantive. There is no need, however, to rest on linguistic analysis.

■ The evidence at trial convincingly established that the WBA consistently has used the phrase "leading available contender" to mean the fighter ranked highest on the WBA's monthly ratings list who was available to fight. Moreover, designations by the World Championships Committee, if they ever occur, are singular exceptions to the standard practice of regarding the highest ranked available boxer as the leading available contender without recourse to the committee. Not only did King so testify in comments credited by the Court,[123] but his testimony was corroborated by correspondence from WBA officials and, in part, by the testimony of English.[124]

On February 2, 2000, the president of the World Championships Committee, Dr. Elias Cordova, Jr., faxed to Lewis a letter reminding him of his obligations to defend timely the WBA title and informing him that the leading available contender was Henry Akinwande.[125] On February 23, 2000, after John Ruiz was re-ranked by the WBA to number one, Dr. Cordova faxed a letter to English informing him that Ruiz had been elevated to the position of "number one contender" and stating that Lewis was obliged under the rules to defend the title against Ruiz.[126] Indeed, the letter made clear that Ruiz was the leading available contender *because he was ranked first in the monthly rankings.*[127] And nei-

---

123. King testified that, in his thirty years of experience with the WBA, the leading available contender has been the boxer who occupies the number one spot on the ratings list. Tr. (King) at 398–99; DX III ¶ 6. If the boxer so rated is unavailable to fight for some reason, leading available contender status goes to the next rated boxer and so forth down the list. Tr. (King) at 403; DX III ¶ 6; *see also* DX BBB ¶ 20. During periods in which the champion is required under the rules to engage in a mandatory title defense, the leading available contender at the time is also the mandatory challenger. Tr. (King) at 399. King testified further that the leading available contender never has been selected by the World Championships Committee in strict accordance with Rule 9.1, as construed by plaintiffs, and that in no event has the leading available contender been someone other than the highest rated available boxer. *Id.* at 400.

124. English conceded that the practice generally was as described by King but contended that the leading available contender in

fact is designated by the World Championships Committee in accordance with the interpretation placed on Rule 9.1 by plaintiffs where the designation of a leading available contender is controversial. Tr. (English) at 414. His testimony on this point, to the extent it differed from King's, was unsupported, inconsistent with the WBA letters, and is not credited by the Court.

125. PX 17.

126. PX 79.

127. *Id.* In relevant part, the letter states: "Mr. Lewis must defend *against the leading available contender* in accordance with the Championship Regulations. The fight must take place no more than 180 days from November 13, 1999 i.e., by May 13, 2000. *As of today Johnny Ruiz is the number one (1) contender according to the January, 2000 ratings." Id.* (emphasis added).

ther letter adverted to any determination by the World Championships Committee, referring instead only to the monthly rating list. Indeed, plaintiffs admitted that there was no such determination by arguing instead that the WBA did not comply with its own rules.[128]

Even if the WBA rules literally and unambiguously made the identity of the leading available contender depend upon formal, discretionary action by the World Championships Committee, which they do not, the WBA's settled practice would have resulted in their *de facto* amendment to conform to that practice. The WBA is a non-profit, membership corporation governed by a constitution and by-laws.[129] In the absence of any prohibitory provision or statute—and none has been cited—these "may be adopted and amended by acquiescence and custom and usage as well as by explicit action taken with all pertinent formality."[130] Given the clear course of dealing in the manner in which the identity of leading available contenders has been determined in practice, the Court finds that the practice would have amended the governing documents even if those documents were not literally consistent with custom and usage. But it is unnecessary to base the decision even on this conclusion.

The ultimate question here is what the parties meant when they contracted that Lewis, if he won Holyfield II, would fight

the WBA's leading available contender according to the WBA rules or vacate its title. Given the lack of clarity of Rule 9.1 and the settled course of WBA conduct in recognizing the highest ranked contender as the leading available contender without any committee action, the contractual language, at best from plaintiffs' point of view, is susceptible of at least two reasonable constructions—one the practical interpretation put forward by DKP and the other the literal analysis advanced by plaintiffs. In these circumstances, the contract is ambiguous as a matter of law, and the Court may look to parol evidence in its search for a construction that reflects the intention of the parties.[131] And the parol evidence here unambiguously yields but one conclusion: the Court finds that the parties intended that Lewis, if he beat Holyfield, would fight the fighter who ranked first on the WBA's monthly ratings or, if that person were unavailable, the next highest ranked available fighter or vacate the title. That, as King testified and as Chwasky, Lomax and Wirt explicitly agreed, was "the deal." There was no failure of any condition precedent for the simple reason that at all relevant times first Akinwande and then Ruiz was the WBA's "leading available contender pursuant to the WBA rules and regulations" within the meaning of the contract and, for that matter, within the meaning of the WBA rules.[132]

128. Pl. Pre–Trial Mem. at 11–25.

129. *See* PX 69.

130. *E.g., Management Technologies, Inc. v. Morris,* 961 F.Supp. 640, 646 (S.D.N.Y. 1997) (collecting authorities).

131. *E.g., Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990).

132. Lewis contends also that the John Ruiz is not the leading available contender because the WBA has failed to comply with Rule 10.3 in selecting him. Pl. Pre–Trial Mem. at 18–20. But this argument is nonsense. Rule 10.3 reads:
"In order to maintain his position in the official ratings, the number one (1) contender must defend his position against any of the outstanding contenders of his weight, category or division, in accordance with the current list of ratings published by the Rat-

ings Committee. The World Championships Committee shall request the number one (1) contender to comply with this rule and if he fails to do so, contender number one (1) may lose his rating as such." PX 70, Rule 10.3, at D 001535.
This rule requires only that, upon request of the World Championships Committee, the leading available contender defend his position against another outstanding contender in his division. It sets forth no prerequisite for becoming leading available contender and therefore fails to speak to the legitimacy of Ruiz's designation as such. Further, plaintiffs have offered no evidence that Ruiz has been asked by the committee to defend his rating and has failed to do so. Contrary to plaintiffs' contention therefore, the WBA clearly has not violated this rule.
The point made in the text disposes also of plaintiffs' contention that there never was

*Construction of Paragraph 10*

Lewis argues finally that paragraph 10, by its own terms, does not require him to fight his *next* bout against the leading available contender or vacate the title, as DKP contends.[133] He bases this argument on two separate phrases in the paragraph.

First, Lewis contends that the phrase "next bout after the Rematch" refers not to Lewis' first fight following the rematch, but to his "next bout ... pursuant to the rules and regulations of the WBA," which Lewis contends will be the next WBA mandatory bout.[134] Although plaintiffs concede that Lewis' next mandatory bout must be against the mandatory challenger or leading available contender, they argue that he is free to fight intervening bouts against others.[135]

This argument is frivolous. Not only does Lewis advance an extremely strained reading of paragraph 10,[136] but his construction would render paragraph 10 a nullity, as the paragraph, so read, would impose no obligation on Lewis at all other than that which he is required to do in any

event under the WBA rules—fight his next WBA mandatory bout against the leading available contender or vacate the title.[137] This is a highly disfavored method of contract construction.[138] Even more to the point, the contract certainly is not unambiguously in Lewis' favor on this point,[139] and the same parol evidence referred to above makes it crystal clear that the interpretation plaintiffs advance is directly contrary to the actual agreement of the parties.

■ Second, Lewis argues that paragraph 10, by its terms, allows him to seek a special dispensation from the WBA exempting him from the requirement that he fight the leading available contender or vacate the title.[140] He points to the language that was so hotly contested in the August 1999 contract negotiations[141]—"if Lewis chooses not to fight such WBA mandatory challenger or leading available contender, Lewis shall vacate the WBA title consistent with the rules and regulations of the WBA."[142] The phrase "consistent with the rules and regulations of the WBA," plaintiffs assert, allows him to avoid either

any leading available contender because Rule 9.1 leaves the timing of the designation unclear, Akinwande was unavailable in November 1999, Ruiz unavailable on February 18, 2000, and the WBA has not designated a leading available contender for May 2000. While the timing aspects of Rule 9.1 indeed are unclear in that the rule does not adequately deal with the fact that the identity of the leading available contender might change during the period in which a champion would be obliged to defend his title against that boxer, there has been no uncertainty in practice and certainly was none insofar as these parties used the phrase "leading available contender" in their agreement. Under the contract, Lewis after the Holyfield rematch was obliged next to fight the highest ranked fighter on the WBA list who was available to fight him. If Akinwande was unavailable, he was obliged simply to go down the ranking list until he found an available fighter.

133. Pl. Pre–Trial Mem. at 30–32; Tr. at 4–5.

134. Tr. (English) at 134; Pl. Pre–Trial Mem. at 30–32.

135. Pl. Pre–Trial Mem. at 30–32.

136. Omitting the ellipses, the relevant sentence of paragraph 10 reads, "[I]f Lewis wins the Rematch, the parties understand and agree that Lewis' next bout after the Rematch shall be against the WBA's mandatory challenger or its leading available contender pursuant to the rules and regulations of the WBA ...." PX 15. Contrary to plaintiffs' suggestion, the positioning of the phrase "pursuant to the rules and regulations of the WBA" reasonably suggest that it modifies "WBA's mandatory challenger or its leading available contender" rather than "next bout."

137. PX 70 (WBA Rules) ¶ 5.4.

138. *E.g., Ronnen v. Ajax Elec. Motor Corp.,* 88 N.Y.2d 582, 589, 648 N.Y.S.2d 422, 424, 671 N.E.2d 534 (1996).

139. Plaintiffs conceded during summation that the language is ambiguous. Tr. at 451.

140. Tr. at 4–6.

141. *See supra* notes 30–61 and accompanying text.

142. PX 15 ¶ 10.

fighting the leading available contender or vacating the title so long as avoidance does not contravene the WBA rules.[143]

Once again, the language upon which plaintiffs rely is no better, from their point of view, than ambiguous. Even assuming that the phrase "consistent with the WBA rules and regulations" reasonably might be understood to require Lewis' next to fight the leading available contender or vacate the title only if the WBA rules and regulations require him to do so, it certainly might be read to mean that Lewis must either fight the leading contender or vacate the title in the manner contemplated by the WBA rules where a champion declines to fight a mandatory challenger or leading available contender. Indeed, both plaintiffs' counsel[144] and English[145] acknowledged this ambiguity, thus acknowledging the propriety of resort to parol evidence on this point as well. And the parol evidence, the Court finds, clearly establishes that the parties intended that Lewis have no such "out." The deal was that he would fight the leading available contender or vacate—it was that simple.

## IV

Having concluded that Lewis is obliged to fight the WBA's leading available contender before he fights anyone else or, alternatively, to vacate the WBA title, the Court comes to the matter of the relief to be granted.

If the Lewis–Grant fight takes place on April 29, 2000, as scheduled, Lewis will breach paragraph 10 of the contract the moment he steps into the ring unless he first vacates the WBA title. Stripping him of the title now therefore is superficially appealing. Yet due regard must be had for the vagaries of life. Likely as it seems that the breach will occur, nothing is certain. The Court's decree must reflect this fact. In consequence, Lewis will be enjoined from fighting Grant or anyone else

until he first fights the WBA's leading available contender unless, prior to fighting Grant or anyone other than the WBA's leading available contender, he first vacates the WBA heavyweight title. By thus framing the decree, the Court will preserve Lewis' freedom to fight whomever he wishes provided he first surrenders the title, but subjects him to the risk of punishment for contempt of court if he does not comply with his obligations.

## V

DKP has counterclaimed against Panix and Main Events for tortiously inducing Lewis to breach the Lewis–Holyfield II contract. The gist of the claim is that Eliades, English and Chwasky are the architects of Lewis' disregard of his contractual obligations to DKP.

In order to prevail on such a claim, a plaintiff must prove the existence of the contract, breach, the defendant's intentional procurement of the breach, and injury.[146] In this case, the parties devoted a fair amount of attention to whether Panix and Main Events procured Lewis' conduct and whether they were privileged to do so by virtue of their relationships to Lewis. But the plain fact is that there has not yet been any breach by Lewis, as he has not yet fought anyone other than the WBA's leading available contender without first surrender his WBA title. If he complies with the Court's decree, there will be no breach. In consequence, DKP has not made out a claim for tortious inducement of breach of contract.

## VI

Final judgment shall enter as follows:

1. The complaint will be dismissed in its entirety. The dismissal of the first and fourth claims for relief is for lack of subject matter jurisdiction, as neither raises a

---

**143.** Tr. at 7.

**144.** Tr. at 451.

**145.** Tr. (English) at 64.

**146.** *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97 (1956).

case or controversy within the meaning of Article III of the Constitution. The dismissal of the second and third is on the merits.

2. DKP's counterclaim against plaintiffs Panix and Main Events will be dismissed on the merits.

3. Lewis will be enjoined from engaging in any boxing match or bout with Michael Grant or any other person unless Lewis first shall have (a) defended his WBA heavyweight title against the WBA's leading available contender or (b) vacated the WBA title and so advised the WBA and DKP in writing.

SO ORDERED.